**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com

*Counsel for Plaintiff Warren Hern*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARREN HERN, Individually and on Behalf of All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>    v.<br><br>ALEXANDRIA REAL ESTATE EQUITIES, INC., PETER M. MOGLIA, MARC E. BINDA, and JOEL S. MARCUS,<br><br>                        Defendants. | Case No. 2:25-cv-11319<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Warren Hern ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Alexandria Real Estate Equities, Inc. ("Alexandria" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Alexandria's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Alexandria securities between January 27, 2025 to October 27, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2.    Defendants provided investors with material information concerning Alexandria's expected revenue and FFO (funds from operations) growth for the fiscal year 2025, particularly as it related to the growth of the Company's real estate operations. Defendants' statements included, among other things, confidence in the Company's lease activity, occupancy stability and ability to develop its tenant pipeline.

3.    Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of its Long Island City (LIC) property; notably, the Company's claims and confidence about the leasing value of the LIC property as a life-science destination aligning with ARE's Megacampus™ strategy.

4.    On October 27, 2025, after the market closed, Alexandria unveiled below-expectation financial results for the third quarter of fiscal year 2025 and, in particular, cut its FFO guidance for the full-year 2025. The Company attributed the setback to lower occupancy rates, slower leasing activity and most notably, a real estate impairment charge of $323.9 million with $206 million attributed to its LIC property.

5.    Investors and analysts reacted immediately to Alexandria's revelations. The price of Alexandria's common stock declined dramatically. From a closing market price of $77.87 per share on October 27, 2025, Alexandria's stock price fell

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to \$62.94 per share on October 28, 2025, a decline of about 19% in the span of just a single day.

## JURISDICTION AND VENUE

6.    Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Alexandria is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.    Plaintiff purchased Alexandria common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Alexandria is attached hereto.

12.    Alexandria Real Estate Equities, Inc. is a California corporation with its principal executive offices located at 26 North Euclid Avenue, Pasadena, CA 91101. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "ARE."

13.    Defendant Peter M. Moglia ("Moglia") was, at all relevant times, the Chief Executive Officer and Chief Investment Officer of Alexandria.

14.    Defendant Marc E. Binda ("Binda") was, at all relevant times, the Chief Financial Officer of Alexandria.

15.    Defendant Joel S. Marcus ("Marcus") was, at all relevant times, the Principal Executive Officer of Alexandria.

16.    Defendants Moglia, Binda, and Marcus Zovighian, Wood, are sometimes referred to herein as the "Individual Defendants." Alexandria together with the Individual Defendants are referred to herein as the "Defendants."

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Alexandria's reports to the SEC, press releases, and presentations to securities analysts, money

4

and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.     Alexandria is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Alexandria under respondeat superior and agency principles.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## SUBSTANTIVE ALLEGATIONS

**A.    Company Background**

20.    Alexandria is a real estate investment trust (REIT) specializing in life-science real estate with a focus on lab space, research facilities and offices for tenants in the pharmaceutical, biotech, and agricultural technology industries.

21.    Alexandria owns, operates and develops collaborative Megacampus™ ecosystems in life science innovation cluster locations including Greater Boston, the San Francisco Bay Area, San Diego, Seattle, Maryland, Research Triangle, and New York City.

**B.    The Defendants Materially Misled Investors Concerning the Growth of Alexandria's Long Island City Property**

*January 27, 2025*

22.    On January 27, 2025, Alexandria issued a press release publishing their fourth quarter results, highlighting, in pertinent part, that there was "continued solid leasing volume" and "1.3 million RSF (rentable square feet) for 4Q24, up 19% compared to our previous five-quarter average."

23.    The press release further detailed occupancy rates in North America and leasing volume, stating, in pertinent part:

*Continued solid leasing volume and rental rate increases*

• Continued solid leasing volume

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

• 1.3 million RSF for 4Q24, up 19% compared to our previous five-quarter average.

• Fourth consecutive quarter with leasing volume exceeding 1 million RSF.

• 5.1 million RSF for 2024, up 19% compared to our 2014–2020 average of 4.3 million RSF.

• Rental rate increases on lease renewals and re-leasing of space were 18.1% and 3.3% (cash basis) for 4Q24 and 16.9% and 7.2% (cash basis) for 2024.

• Rental rate increases on lease renewals and re-leasing of space were 18.1% and 3.3% (cash basis) for 4Q24 and 16.9% and 7.2% (cash basis) for 2024.

• 84% of our leasing activity during the last twelve months was generated from our existing tenant base.

• Tenant improvements and leasing commissions on renewed and re-leased space executed during the year ended December 31, 2024 represented only 8.4% of total lease term rents, the second lowest percentage of total lease term rents in the past five years.

24. During the earnings call held on January 28, 2025, CEO Peter M. Moglia elaborated on the Company's development pipeline and leasing supply stating, in relevant part:

7

In the fourth quarter, we delivered 602,593 square feet into our high barrier to entry submarkets, bringing total deliveries for the year to 2,457,963 square feet covering 13 projects. The annual incremental NOI delivered during the year was approximately $118 million, including $55 million in the fourth quarter. ***Another $395 million is expected to deliver beginning in 2025 through the second quarter of 2028. The initial weighted average stabilized yield for 2024 deliveries was 6.7%, supported by a solid stabilized yield on cost of 7.1% from our fourth quarter delivery.***

\*       \*       \*

***Alexandria's pipeline is well positioned to capture future demand when expansion needs arise. Our dominant existing tenant base allows us to get in front of many requirements before they reach the market, and our location, scale and sponsorship matter a lot to tenants as we statistically illustrated at Investor Day.***

(Emphasis added).

25.    On the same call, CFO Marc E. Binda confidently spoke about Alexandria's growth potential and expectations in 2025, stating, in relevant part:

*[o]n internal growth, our solid operating results for the quarter continue to be driven by our disciplined execution of our megacampus strategy, tremendous scale advantage, long-standing*

8

*tenant relationships and operational excellence by our team. 77% of our annual rental revenue comes from our collaborative megacampuses, and we hope to increase this steadily over time. We have high-quality cash flows with 52% of our annual rental revenue from investment-grade and publicly traded large-cap tenants.*

\*       \*       \*

*On leasing, an important takeaway for the quarter is the continued solid leasing volume driving our business. Leasing volume for the quarter was 1.3 million square feet, which represents the fourth consecutive quarter over 1 million square feet and creates great momentum as we transition into the new year.*

\*       \*       \*

*Leasing volume for the full year '24 was 5.1 million square feet, up 17% over the prior year and up 19% compared to the 7-year historical period prior to 2020. We continue to benefit from our tremendous scale, high-quality tenant roster and brand loyalty with 84% of our leasing activity over the last 12 months coming from our existing deep well of approximately 800 tenant relationships.*

\*       \*       \*

*Our outlook for full year '25 same-property growth is consistent with our prior outlook at down 2% and flat on a cash basis at the midpoint.*

*These projected results for 2025 include the impact of approximately 2.6% and 3.4% on a cash basis from the $768,000 of lease expirations expected to go vacant in 1Q '25 spread across 4 projects.* As a reminder, the 2 largest components of those key 1Q '25 lease expirations relate to Alexandria Technology Square with a move-out and expansion to another Alexandria property by Moderna and our single-tenant building at 409 Illinois in Mission Bay.

*    *    *

*Turning to occupancy. Occupancy for the quarter was solid at 94.6%, which is consistent with the steady results over the last 5 quarters. The midpoint of our guidance range for occupancy for year- end '25 is 92.4%, which includes approximately 2% vacancy coming from the 4 projects, with 1Q '25 lease expirations expected to go vacant that I described earlier and are described on Page 24 of our supplemental package.*

*    *    *

*Turning to guidance. We reaffirmed our guidance for 2025 with $150 million change to our '25 sources of capital to reflect the closing of certain dispositions that were originally expected to close in 2024 and are now expected to close in 2025. There were no changes to the*

*midpoints of our guidance ranges for EPS of $2.67 and FFO per share diluted as adjusted of $9.33.*

\*     \*     \*

*In closing, as we reflect on the fourth quarter and the full year of 2024, we're pleased with the tremendous execution with solid FFO growth of 5.6% in a very tough macroeconomic environment. With our tremendous scale, high-quality cash flows, deep industry relationships and our highly experienced management team, we're well positioned to continue reinforcing our dominant platform and strategically position us for future growth.*

(Emphasis added).

26.    During the question-and-answer segment of the earnings call, Defendants fielded multiple questions concerning Alexandria and continued to display confidence in the Company's leasing volume in their answers during the following pertinent exchanges:

<Q: Wesley Keith Golladay– Robert W. Baird & Co., Research Division - Analyst> I just want to go back to that comment about just-in-time leasing. What does that mean for your 2026 developments? Would that be more back half leasing this year? Would it be all the way until next year that we see leasing there?

<A: Peter M. Moglia > Yes. Certainly, things that are delivering in 2026 are just not top of mind for folks that are deciding they need space and then go out to the market and identify things within 60 to 90 days…***But we certainly do have our existing tenant base that just loves our platform, loves our operations and has been very loyal. So we certainly do see ourselves getting things done in 2026. I think I mentioned we're 70% leased or under negotiations, which means we have signed LOIs for 70% of that space. So the other 30% will likely come from our existing tenant base or potentially some new tenants, but those are in pretty good shape. It's getting into '27 where we're still too far out for folks thinking. So we're going to do our best to generate some more activity there, but the market is really just looking at things that they can get into a very short time or a relatively short time frame. But the '25 and the '26 deliveries are in pretty good shape.***

· · ·

<Q: Vikram L. Malhotra–Mizuho Securities, Research Division - Analyst > I guess, Joel, just bigger picture, leasing velocity is sort of critical now given sort of deliveries hopefully coming in towards the back half, but critical for the industry, critical for the ARE story as well. Can you just -- I know you don't want to comment on 1Q, but just even bigger picture, how do you anticipate leasing inflecting? Any numbers

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

you can share like tenants in the market or even just how the pipeline has changed Q-over-Q? Just feels like that's a critical piece. And I'm wondering if you can just share some statistics how '25 could evolve versus '24.

<A: Joel S. Marcus > Yes. I think that's the kind of question that I'd really prefer to leave for first quarter when we can give you, I think, more granularity that we feel comfortable with. ***Remember that the bulk of our tenants in the variety of sectors we service under the life science industry as a whole that Hallie mentioned come from our own tenant base. So we have a really, really good picture, over 800 tenants of each and every market and what the demand is, quite apart from what people that the brokers may represent or what they see.*** They often don't see much of what we see. And oftentimes, we may sign leases or LOIs where brokers simply aren't aware of those things. So I don't really want to get into first quarter. I want to kind of get into the details there. So I'd ask you just to be patient and bear with us. ***But I think we're going to have some pretty good news.***

<Q: Vikram L. Malhotra–Mizuho Securities, Research Division - Analyst > And then just sorry, last one, if I can clarify, you mentioned you feel pretty good about the lease-up of the developments into '25, '26. Maybe '27, the question starts. But would there be factors that cause

13

you to pause any of the developments in either '25 or '26, push it out into '27, say?

<A: Joel S. Marcus > No. ***I think what Marc published in the press -- the supp and press release is our best guess of how we think our allocation of capital should match the demand we're seeing. So I don't expect any material changes certainly to '25 or '26 post this print.***

(Emphasis added).

*April 28, 2025*

27.    On April 28, 2025, Defendants published their first quarter financial results, announcing "continued solid leasing volume of 1.0 million RSF during 1Q25, the fifth consecutive quarter with leasing volume exceeding 1 million RSF."

28.    The release also highlighted Alexandria's strong development pipeline and significant leasing progress stating, in pertinent part:

*Alexandria's development and redevelopment pipeline delivered incremental annual net operating income of $37 million commencing during 1Q25, with an additional $171 million of incremental annual net operating income anticipated to deliver by 4Q26*

• During 1Q25, we placed into service development and redevelopment projects aggregating 309,494 RSF that are 100% leased across multiple submarkets and delivered incremental annual net operating income of

$37 million. A significant 1Q25 delivery was 285,346 RSF at 230 Harriet Tubman Way located at the Alexandria Center® for Life Science – Millbrae in our South San Francisco submarket.

• Our active development and redevelopment projects under construction, primarily related to our Megacampus ecosystems, have an estimated $2.4 billion of remaining costs to complete, of which $1.3 billion is not under contract as of March 31, 2025. Additionally, we estimate that 30%–40% of the costs not under contract represent costs for materials that may be subject to inflationary pressure and/or potential tariffs. As such, we estimate that each 10% increase in these costs for materials may result in incremental costs aggregating $40–$50 million and a corresponding decline in initial stabilized yields of approximately 2.5 to 3.5 basis points for our existing active development and redevelopment projects. This estimate does not account for the cost of potential delays that may occur in receiving or replacing materials subject to tariffs.

• Annual increase by $61 million by 4Q25 upon the burn-off of initial free rent, which have a weighted average burn-off period of approximately four months.

• 71% of the RSF in our total development and redevelopment pipeline is within our Megacampus ecosystems.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

29.     During the corresponding earnings call held on April 29, 2025, Defendants provided some clarity for the Company's slight decrease in revenue and updated guidance. In pertinent part, CEO Moglia stated:

> *Turning to the impact of tariffs on our active development and redevelopment pipeline. Spoiler alert, they are not expected to have a material influence on our yields.*
>
> *    *    *
>
> *Transitioning to leasing and supply. Alexandria's superior quality, location, scale and sponsorship enabled the leasing of 1,030,553 square feet in the first quarter at solid rental rate increases for renewed and released space of 18.5% and 7.5% on a cash basis, and the weighted average lease term was very strong at 10.1 years.* This is the fifth straight quarter where we've exceeded 1 million square feet of leasing. And despite elevated concessions, net effective rents on re-leasing and renewal space remain positive. *We have a solid list of prospects for our development and redevelopment projects, but activity for this leasing segment, which is typically driven by expansion requirements, remains muted for the moment due to continuing conservatism from life science company management teams and boards.*
>
> *    *    *

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> ***Here are the takeaways. We continue to deliver transformative projects and incremental NOI from our pipeline. Tariffs will not create material dilution to our current pipeline projects.*** We continue to execute solid leasing, competitive supply deliveries are winding down, and we're making good progress on our asset harvesting and recycling program.

(Emphasis added).

30.    CFO Binda highlighted that despite the macro issues facing the Company, its leasing volumes and growth in FFO per share diluted as adjusted through 2025 remained solid stating, in pertinent part:

> ***As Peter highlighted, our leasing volume continues to be solid with over 1 million square feet leased during the quarter and represents the fifth consecutive quarter over 1 million square feet. We continue to benefit from our tremendous scale, high-quality tenant roster and brand loyalty with 89% of our leasing activity in the quarter coming from our existing deep well of approximately 750 tenant relationships.*** We also continue to dominate in our core submarkets, getting more of the deals in many of our submarkets than the next several landlords combined. Rental rate growth for lease renewals and re-leasing of space for the quarter was a solid 18.5% and 7.5% on a cash basis, which is at or above the high end of our guidance ranges for the

17

year. We continue to achieve very healthy lease terms on completed leases with 10 years on average for the quarter, which is above our historical 10-year average.

\*      \*      \*

**Overall, for the full 2.9% reduction in occupancy, we're making very good progress on resolving these with about 1/4 of this amount leased with a future delivery date around the end of this year.**

\*      \*      \*

The details of our guidance are included on Page 4 of our supplemental package. Our guidance for FFO per share diluted as adjusted was reduced by $0.07 to a midpoint of $9.26, which puts the revised midpoint at the low end of our initial range for FFO per share results and represents a change of 75 basis points from our initial guidance. **Even with this change, our estimate for 5-year growth in FFO per share diluted as adjusted through 2025 is 27%, which puts us near the top end of the range among the peers in the 15 NAREIT Equity Healthcare REIT Index.**

(Emphasis added).

31.    During the question-and-answer portion of the call, which featured questions related to Alexandria's updated guidance, Defendants reiterated the

Company's success and displayed confidence in continued growth despite the current macro environment stating, in relevant part during the following exchanges:

<Q: Farrell Granath – Bank of America Securities, Research Division – Analyst> I was wondering if you can walk us through with the new guidance, does this encompass a worst-case scenario, especially in terms of what could happen in the biotech market, specifically with capital raising? Or within the range, is there a worst case and best case scenario baked in?

Specifically when it comes to leasing going forward when it comes to the demand and specifically if there's continued cuts when it comes to NIH funding or even further reduction.

< A: Marc E. Binda > Yes. Look, I think the estimate we put out there is our best estimate with the facts that we know today. So it's not the best case, and it's not the worst case. It's really our estimate with the facts that we know today.

. . .

<Q: Anthony Paolone - JPMorgan Chase & Co, Research Division – Senior Analyst > Joel, last quarter, you talked about, I think, a couple of pockets of demand maybe starting to emerge, and you were pretty optimistic about some messaging you might have on the first quarter

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

call based on what you were seeing then. I mean do you feel like that emerged? Or did things just change quite a bit in the last few months?

<A: Joel S. Marcus> *I would say that they haven't changed and stay tuned. I think we continue to see, and Hallie did a good job of describing the multifaceted demand that we're seeing given the more muted environment we're in, in the pie chart we put out there this time. But I think over the coming few weeks or month or 2, I think we'll have some things that will be viewed as very positive. It's just time just it just takes time to do that, but nothing is changing for the negative.*

. . .

<Q: Peter Dylan Abramowitz - Jefferies LLC, Research Division– Equity Analyst> Just wondering, as you have conversations internally, especially, I guess, as it relates to the change in the guidance, certainly, you've outperformed a lot of your markets in terms of occupancy loss. But just curious, your internal conversations, do you have a sense of where you think occupancy could bottom in the portfolio, the time line for how that could happen and then kind of what you would need to see to start to see an inflection?

<A: Marc E. Binda > Yes. *We definitely look space by space. I mean I do think that we had a large amount of expirations that came*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*proportionately in the first quarter here, Peter. So I do think that, that was a little unusual that it was that large in a particular quarter. And of course, we knew that we had a couple of big suites coming back to us that will require some time.* The couple of projects in that $768,000 many of those -- most of those will take some time to release. So those -- we're not expecting that at least that 768,000 that much of any of that will be delivered this year.

(Emphasis added).

### *July 21, 2025*

32.     On July 21, 2025, Alexandria issued a press release publishing their second quarter results, highlighting, adjusted FFO and total revenue were above consensus estimates. Further, the release reported the company was maintaining its full-year FFO guidance with cash net operating income increasing year-over-year and leasing spreads remaining solid, stating in pertinent part:

*Leasing volume and rental rate increases*

• Leasing volume of 769,815 RSF during 2Q25.

• In July 2025, we executed the largest life science lease in company history with a longstanding for a 16-year expansion build-to-suit lease, aggregating 466,598 RSF, located on the Campus Point by Alexandria Megacampus in our University Town Center submarket. If this were included in the leasing volume for 2Q25, the total leased RSF would

have increased to 1.2 million RSF for 2Q25 from 769,815 RSF. Refer to "Subsequent events" in the Earnings Press Release for additional details.

• Rental rate increases on lease renewals and re-leasing of space of 5.5% and 6.1% (cash basis) for 2Q25 and 13.2% and 6.9% (cash basis) for 1H25.

• 84% of our leasing activity during the last twelve months was generated from our existing tenant base.

33.    During the corresponding earnings call held on July 22, 2025, Defendants acknowledged the slight dip in occupancy rates but reiterated "prior guidance for year-end 2025 occupancy at 90.9% to 92.5%" and continued to tout Alexandria's development pipeline and the Board's ability to maintain the company divided at its current level with CFO Binda stating, in relevant part:

> *Occupancy at the end of the quarter was at 90.8%, which was down 90 basis points from the prior quarter. With 75% of our annual rental revenue coming from our highly distinguished Megacampus platform, we continue to outperform the rest of the market on occupancy in our biggest 3 markets.*
>
> *We are reiterating our prior guidance for year-end 2025 occupancy at 90.9% to 92.5%. An important note about our occupancy guidance is that we have 669,000 square feet or about 1.7% occupancy of least*

*but not yet delivered space, which will positively impact our occupancy in early 2026 on average upon delivery. In addition, our year-end occupancy guidance assumes around a 2% benefit from assets with vacancy, which are expected to be sold of which about 1/3 of that is subject to a signed purchase and sale agreement.*

\*    \*    \*

*Next on the development pipeline. With projects under construction and expected to generate significant NOI over the next few years and other earlier-stage projects undergoing important entitlement, design and site work necessary to be ready for future ground-up development, we are required to capitalize a portion of our gross interest cost….We remain focused on continuing these important preconstruction activities for our future pipeline where it makes good financial sense to continue.*

\*    \*    \*

For the second quarter, our Board elected to maintain the dividend at its current level of $1.32 per quarter or a dividend yield of 7.3% as of quarter end. Turning next to guidance. *We are holding firm on our guidance for FFO per share diluted for '25 at $9.26 per share at the midpoint of our guidance range.*

(Emphasis added).

34.     On the same call, CEO Moglia touted Alexandria's development pipeline and leasing spreads stating, in relevant part:

> *In the second quarter, we leased approximately 770,000 square feet with leasing spreads of 5.5% and 6.1% on a cash basis. We were very pleased that tenant improvements and leasing commissions on renewals were down 40% compared to previous 2 quarters and although free rent was elevated, it enabled us to secure a relatively high average duration of 9.4 years. The lease duration was also healthy for developed and redeveloped and previously vacant space at 12.3 years. One key result of the quarter we'd like to highlight is that our focused effort on development and redevelopment leasing has started to gain traction.*

(Emphasis added).

35.     During the question-and-answer segment of the earnings call, Defendants answered multiple questions concerning the company's occupancy guidance and continued to tout Alexandria's growth in leasing volume despite occupancy headwinds stating, in pertinent part, during the following exchanges:

<Q: Anthony Paolone JPMorgan Chase & Co, Research Division – Senior Analyst> First question is I just wanted to follow up on some of the occupancy comments you made. And so I guess, if I'm understanding the dispositions, right, if we were to put those aside and

think about sort of the remaining portfolio over the course of the year. Did you mention that occupancy will be down 2% then in the second half, like kind of if you ignore sort of the dispositions?

<A: Marc E. Binda > Yes. ***Tony, in terms of kind of the bridge to year-end occupancy were at 90.8% today, so kind of right at the -- or just below the bottom end of our range. We're expecting a pickup in occupancy given as Peter said, a big chunk of the assets that we've identified for sale are non-stabilized, so they have some vacancy. So we're expecting some pickup as those assets get sold and then you've got the normal kind of leasing to do on the back half of the year.*** So you put all those pieces together, that's how we get to our year-end number.

<Q: Anthony Paolone JPMorgan Chase & Co, Research Division – Senior Analyst> And then -- because then you mentioned you also have a bunch of signed but not yet commenced stuff that sounds like that kind of picks up a couple of points early next year? And I guess where I was going with that is you also added this disclosure around the 2026 expirations and it seems like there's a couple of points that might come out early next year there as well. And so just trying to get the next few quarters kind of understand the trajectory and because you laid out a lot of good pieces.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<A: Marc E. Binda > Yes. There's a lot of moving pieces. *We've got the 600-and-change or the 1.7% benefit to occupancy. And then we've also got some work to do on some of these '26 expirations. A little too early to give you a clear guidance in terms of what downtime looks like on that as we're really still working through the business plans and the re-leasing strategy on those things.*

<Q: Vikram L. Malhotra Mizuho Securities USA LLC, Research Division – Senior Analyst> And then just second one, I guess, you laid out a part about occupancy headwinds near term. But maybe if we can step back, can you give us a sense of how you see this playing out call it, over the next 18 months. So when are we going to trough for ARE specifically? And maybe if you can embellish that a little bit of like how strong is the potential build-to-suit pipeline for you guys?

<A: Marc E. Binda > Yes. I would just refer you, Vikram, to the discussion we had with Tony earlier in the call, where we held our occupancy guidance where it was at. we're right just below the low end of the guidance range right now at 90.8%. *We've got a good head start in terms of what that looks like for next year with the space that's leased that is going to be delivering. But at the same time, we've got the lease rolls that we highlighted that we need to deal with as well,*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

***and we'll have kind of more to come on those as we flesh out the re-***

***leasing strategies, hopefully, in the coming quarters.***

(Emphasis added).

36.    The above statements in Paragraphs 22 to 35 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's leasing spreads, development tenant pipeline, and anticipated occupancy growth for its life-science properties, specifically its LIC property while also minimizing risk from macroeconomic fluctuations. In truth, the Company's LIC value and potential growth as a life-science destination had been declining for years. Alexandria's optimistic reports of the Company's development pipeline, high occupancy rates in North America and anticipated leasing growth utilizing the Company's Megacampus™ strategy fell short of reality as Defendants overstated its LIC property's value as a life-science destination and downplayed its declining leasing value and occupancy stability.

## C.    The Truth Emerges during Alexandria's Third Quarter Earnings Report

### *October 27, 2025*

37.    On October 27, 2025, Defendants released their third quarter financial results for 2025 that were below expectations and in particular, cut its FFO guidance for the full-year 2025. The release detailed the setback to lower occupancy rates,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

slower leasing activity and most notably, a real estate impairment charge of $323.9 million with $206 million attributed to its LIC property stating, in pertinent part:

Key changes to our 2025 guidance include the following:

1) The midpoint of our guidance range for 2025 net (loss) income per share was reduced by $3.44 from $0.50 to $(2.94). In addition to the items discussed in item 2 below, the update to our guidance range for 2025 net (loss) income per share includes the following:

• Potential additional impairments of real estate (including impairments on stabilized and non-stabilized properties and land) that may be recognized in 4Q25 ranging from $0 to $685 million, related to assets that could potentially be sold in 4Q25 or 2026 2026, and if such assets meet the held for sale criteria in 4Q25, considering market factors, buyer ability to perform, our desire to proceed with a sale at a particular price, and other factors.

• Potential additional gain on sales of real estate that may be recognized in 4Q25 ranging from $0 to $240 million related to assets that may be sold in 4Q25.

• These potential impairments and gains on sales of real estate will not impact our funds from operations per share pursuant to the Nareit definition of funds from operations.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

38.     During the accompanying earnings call held on October 28, 2025, CFO Binda elaborated on the setbacks, highlighting the challenging macro environment and discussing the significant real estate impairment relating to the Company's investment of its LIC property. In relevant part, Defendant Binda stated:

> ***Our team continues to navigate a challenging environment given macro industry and policy factors beyond our control.*** Please refer to our earnings release for our EPS results. FFO per share diluted as adjusted was $2.22 for 3Q '25 and included the following three key impacts compared with the prior quarter.
>
> *        *        *
>
> ***We've completed $508 million of dispositions to date, which leaves $1 billion to complete in the fourth quarter, all of which are subject to non-fundable deposits, signed LOIs or purchase and sale negotiations. In connection with our disposition program, we recognized impairments of real estate of $323.9 million during the quarter, with approximately 2/3 of that coming from an investment in our Long Island City redevelopment property.***
>
> Three items to highlight here. First, we acquired the site in 2018. That submarket suffered a substantial setback when Amazon abandoned its plan for new HQ in that location in 2019 and it never recovered. Second, despite the lower rental rate price point and our dominance in

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

that submarket, it has been challenging to get a critical mass of life science tenants to go to this location. ***And ultimately, we don't view it as a life science destination that can scale. And third, this location has become more of an industrial flex and cinema submarket rather than life science.***

Ultimately, at the end of September, we decided future capital needs and the sale proceeds related to this project would be better recycled into our Megacampuses where we have greater conviction long term. ***Looking forward, we have a number of assets under consideration for sale either by the end of this year or sometime in 2026 that have estimated values below our carrying values ranging from $0 to $685 million. Although these potential impairments have not been triggered and final decisions to proceed have not been made, we updated our guidance range for 2025 to reflect these potential additional impairments in the fourth quarter.*** We anticipate an end to the large-scale non-core asset program by the end of 2026 or early 2027. We also expect dispositions to provide the vast majority of our capital needs for next year.

*       *       *

***We provided updated guidance for FFO per share diluted as adjusted for 2025, which was reduced by $0.25, or about 2.7%, to a midpoint***

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*of $9.01 per share.* This change was primarily due to lower investment gains and lower same-property performance driven by lower occupancy.

(Emphasis added).

39.     During the question-and-answer portion of the call, Defendants elaborated on the Company's setback with regard to the impairment setback, recent tenant activity and potential demand in the near future for its real estate assets stating, in relevant part during the following exchange:

<Q: Farrell Granath - BofA Securities – Analyst> I first just want to touch on -- I know last quarter, you had some commentary about potential benefits to occupancy, about 600,000 or 1.7%. I was curious on the update and your expectations or line of sight that you're seeing now?

<A: Marc E. Binda> …It's primarily at properties located in Greater Boston, San Francisco, San Diego and Seattle. *And it's about $46 million of -- potential annual rental revenue of $46 million. And we expect it to deliver on average. There's a lot of spaces in there, as you can imagine, but on average, around May 1 of next year.*

<Q: Farrell Granath - BofA Securities – Analyst> And also, I guess, a broader question. In previous calls, we've heard that there was early positivity around leading indicators in the biotech market. And you

made a few comments around that. But it generally still feels like you're very much seeing the impacts of supply and demand. And I'm curious, what would turn your perspective or optimism a little bit higher, either if that's greater IPOs or different capital market movements?

<A: Joel S. Marcus> Yes. That's also a really important question. I think the two -- well, there are three missing links, as I mentioned in my opening comments, to demand today, and Hallie can give you chapter and verse on the green shoots that we're seeing, which are substantial from the capital market side to M&A, et cetera. ***But one is the FDA -- the government shutdown has to stop and the FDA has to open. Number two, venture -- earlier-stage venture-backed companies have to start making commitments for space as opposed to kind of holding, waiting for cost of capital issues with the fed and broadly in the industry.***

***And I think, three, the public biotech sector, which has been, to a large extent, the mainstay of this industry as far as space and demand has to be reignited.*** And even though the XBI is up substantially, that has not yet translated into action. So I think those are the key things we're looking for.

***And institutional demand, if the NIH can get its act together on the issues we talked about, one, making sure they're fully funded and***

*disbursing funds and that there's an unlocking of the current bar to*

*the 15% [ indirect ] cost limitation.*

. . .

<Q: Wesley Keith Golladay Robert W. Baird & Co. – Senior Research Analyst> I was just looking at the future pipeline, the $3 billion and the $1.2 billion, how much of the potential residential land plays will come out of that bucket? And then when you also look at the potential for $685 million of impairments, would that mostly fall in that bucket as well?

<A: Marc E. Binda> …*Just to be clear, the $685 million is -- relates to a variety of assets that are under consideration. So there's a variety of ways that, that could go. It just depends on what happens with the buyer, if we can get a price that we like, et cetera, some of these assets we could end up holding if we decide to pivot. But the $685 million, I would say the bigger chunk there has to do with land-type assets.*

<Q: Wesley Keith Golladay Robert W. Baird & Co. – Senior Research Analyst> And then for the leases that are going to commence in, I guess, the first half of next year, was there any -- it looks like there might have been a small delay on that. Was that anything like permitting-wise or just the tenant looking to move in a little bit later?

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<A: Marc E. Binda> Yes. No, I don't know that there was necessarily a delay. It's just a -- that bucket continues to evolve, right, as some of it gets delivered and then we're obviously adding new stuff there, right? We're leasing space that then extends that. So that will be an evolution just because that bucket changes from quarter-to-quarter.

. . .

<Q: Michael Albert Carroll - RBC Capital Markets, Research Division – Head of US Real Estate Research > Can you provide some color on the type of tenant activity that the company is tracking right now? I mean it sounds like in the prepared remarks that you're seeing activity being kind of flat despite the XBI uptick. But are there certain tenants looking for different types of spaces? I mean, how many tenants are looking for like the Class A space versus the Class B space? I mean is there different price points that tenants are looking at just given them trying to extend their cash burn rates given the current uncertainty?

<A: Joel S. Marcus> **Well, yes, that's almost an impossible question to answer because if you look at the press release and supp, we put a pie chart of our -- the tenant sectors in there, and there is certainly demand from almost all of those. There's no government demand. And at the moment, there's muted institutional demand, although we're working on one big deal as we speak.** But aside from that, I think

what we said is, and it varies submarket by submarket, each submarket has its own particular dynamics. Some are pretty well in balance with supply and demand, others are imbalanced. And so that is a little bit different. But I think across the board, there is demand.

***I think what the commentary really is, is that given the recovery in the XBI, we're a little surprised that demand hasn't followed as much.*** It's not as obvious than maybe in past times, but the reason for that is clear, cost of capital and federal interest rates are being stubbornly high. The government has shut down. The FDA is closed by and large, and there's a lot of logjams out there that are preventing company -- and the IPO market is shut by and large. There's a little bit of activity, but it really isn't an opening. I think those are the factors.

***But there's demand from a variety of sectors. But again, it's very case specific. And it also depends on, when you say Class A, you tend to have revenue-producing companies looking for Class A space or companies that are extremely well-capitalized.*** Others are looking for either moved out space or second -- true second-generation space after a 5-, 7-, 10-year lease, so it varies all over the marketplace.

(Emphasis added).

40.     On October 29, 2025, Defendants filed a Form 8-K with the SEC stating in pertinent part:

> Based on our current view of market conditions and in consideration of the factors included in the "Summary of Key Items that May Impact 2026 Results" section of our most recent quarterly report on Form 10-Q, as reiterated below, we expect the midpoint of our range for funds from operations per share – diluted, as adjusted for the year ending December 31, 2026 to be within the range of $6.25 to $6.85.

41.     The aforementioned press releases, SEC filings and statements made by the Individual Defendants are in direct contrast to statements they made during the January 28, April 29, July 22, 2025 earnings and shareholder calls. On those calls, Defendants continually touted the Company's solid leasing spreads and occupancy rates in North American, development tenant pipeline, and anticipated occupancy growth for its life-science properties, specifically its LIC property. All-the-while Defendants downplayed the fact that its LIC property's lease value and occupancy stability had been declining for years.

42.     Investors and analysts reacted immediately to Alexandria's revelation. The price of Alexandria's common stock declined dramatically. From a closing market price of $77.87 per share on October 27, 2025, Alexandria's stock price fell to $62.94 per share on October 28, 2025, a decline of about 19% in the span of just a single day.

43.     A number of well-known analysts who had been following Alexandria lowered their price targets in response to Alexandria's disclosures. For example, Evercore ISI analyst commented on ARE's Q3 report and subsequent 8K filing, stating, in pertinent part:

> In retrospect, we were too optimistic regarding the turn in life science fundamentals and capital markets backdrop, that influenced our modeling heading into Q3. In addition, we underestimated the duration and degree of the operating headwinds (known tenant vacates, limited additional leasing in the dev/redev pipelines, capital recycling timeframes, etc.) that ARE continues to confront.

(Emphasis added).

44.     Similarly, J.P. Morgan, while also cutting their price target, noted that "…ARE is in the midst of a 'reset' with regards to selling non-core assets and making its way through a difficult patch of weak demand for life science real estate and also heavy supply."

45.     The fact that these analysts, and others, discussed Alexandria's below-expectation projections suggests the public placed significant weight on Alexandria's statement of prior confidence in its leasing activity, development tenant pipeline, and anticipated occupancy growth for its life-science properties, specifically its LIC property. The frequent, in-depth discussion of Alexandria's

guidance confirms that Defendants' statements during the Class Period were material.

### D.    Loss Causation and Economic Loss

46.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Alexandria's common stock and operated as a fraud or deceit on Class Period purchasers of Alexandria's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Alexandria's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Alexandria's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

47.    In particular, on October 27, 2025, Alexandria announced third quarter financial results for 2025 that were below expectations and in particular, cut its FFO guidance for the full-year 2025. The Company attributed the setback to lower occupancy rates, slower leasing activity and most notably, a real estate impairment charge of $323.9 million with $206 million attributed to its LIC property.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### E.    Presumption of Reliance; Fraud-On-The-Market

48.    At all relevant times, the market for Alexandria's common stock was an efficient market for the following reasons, among others:

(a)    Alexandria's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Alexandria communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Alexandria was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Alexandria was reflected in and incorporated into the Company's stock price during the Class Period.

49.    As a result of the foregoing, the market for Alexandria's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Alexandria's stock price. Under these circumstances, all purchasers of Alexandria's common stock during the Class

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Period suffered similar injury through their purchase of Alexandria's common stock at artificially inflated prices, and a presumption of reliance applies.

50.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### F.    No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

51.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

52.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

53.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Alexandria who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

54.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Alexandria's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Alexandria's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Alexandria or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 15, 2025, there were 172.8 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

56.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Alexandria;

(c)    whether the Individual Defendants caused Alexandria to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Alexandria's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.

There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

60.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Alexandria's common stock; and (iii) cause Plaintiff

and other members of the Class to purchase or otherwise acquire Alexandria's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

63.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Alexandria's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

64.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Alexandria's internal affairs.

66.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Alexandria's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Alexandria's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Alexandria's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

67.    During the Class Period, Alexandria's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Alexandria's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Alexandria's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Alexandria's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock

during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

70.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Alexandria's misstatements.

72.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Alexandria which had become materially false or misleading.

73.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Alexandria disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to

cause Alexandria to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Alexandria's common stock.

74.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Alexandria to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75.     By reason of the above conduct, the Individual Defendants and/or Alexandria are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


Dated:  November 25, 2025                    Respectfully submitted,

                                            **LEVI & KORSINSKY LLP**


                                            /s/ Adam Apton
                                            Adam M. Apton (SBN 316506)
                                            515 South Flower Street
                                            18th and 19th Floors
                                            Los Angeles, CA 90071
                                            Tel: (213) 985-7290
                                            Email: aapton@zlk.com

                                            *Counsel for Plaintiff Warren Hern*