**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
jpafiti@pomlaw.com
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190

*Counsel for Lead Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARREN HERN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDRIA REAL ESTATE EQUITIES, INC., *et al.*,<br><br>Defendants. | Case No. 2:25-cv-11319-GW (AGRx)<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................... 1

II.     JURISDICTION AND VENUE ............................................................... 6

III.    PARTIES ................................................................................................. 6

IV.     SUBSTANTIVE ALLEGATIONS .......................................................... 8

        A.      The Company's Business Model ................................................. 8

        B.      Alexandria's Disposition Strategy .............................................. 9

        C.      Alexandria's Extraordinary Real Estate Impairments ............... 12

        D.      The Impaired Properties Included Megacampuses That Diverged From Alexandria's Disposition Strategy ....................... 20

        E.      The Impaired Properties Were Impaired Far Earlier Than the Company Disclosed ............................................................... 23

                a.      The Company's Disclosure of the Impaired Properties Admitted That They Were Impaired Much Earlier ........................................... 23

                b.      Additional Factors Show That the Impairments Were Present Earlier ...................................... 30

                        i.      The Long Island City Property ................... 30

                        ii.     The San Francisco Mega Campus ............... 33

                c.      Confidential Witnesses Show That the Impairments Were Present Earlier ...................... 38

                        i.      CW 1 .......................................................... 38

                        ii.     CW 2 .......................................................... 42

        F.      Alexandria Was Required to Disclose Its Impairments Under GAAP ....... 42

                a.      GAAP Standards for the Impairment of Real Estate ............. 43

                b.      The Company Represented That it Complied With GAAP ... 49

i

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

      c.    The Company Violated GAAP Standards for the Impairment of Real Estate ...................................................................51

   G.    The Individual Defendants Profited from their Fraud ................................58

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ..................................................59

VI.   THE TRUTH EMERGES ......................................................................90

VII.  ADDITIONAL SCIENTER ALLEGATIONS ....................................................102

VIII. NO SAFE HARBOR ..........................................................................104

IX.   CLASS ACTION ALLEGATIONS ............................................................105

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS ..................................107

XI.   CAUSES OF ACTION ........................................................................108

COUNT I ..............................................................................................108

COUNT II .............................................................................................110

XII.  PRAYER FOR RELIEF .......................................................................111

XIII. DEMAND FOR TRIAL BY JURY ............................................................112

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

Lead Plaintiff Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., and Menora Mivtachim Vehistadrut Hamehandesim Nihul Kupot Gemal Ltd. (collectively, "Lead Plaintiff"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, as for their Amended Class Action Complaint against Defendants Alexandria Real Estate Equities, Inc. ("Alexandria" or the "Company"), Peter M. Moglia ("Moglia"), Marc E. Binda ("Binda"), Joel S. Marcus ("Marcus"), Hallie E. Kuhn ("Kuhn"), and Hunter L. Kass ("Kass") (collectively, "Defendants," and, together with Lead Plaintiff, the "Parties"), allege the following based on personal knowledge as to their own acts and on information and belief as to all other matters based upon the investigation conducted by Lead Plaintiff's counsel, which has included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Alexandria, analysts' reports and advisories about the Company, consultation with accounting and real estate experts, interviews of confidential witnesses, and information readily obtainable on the Internet. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I.   <u>INTRODUCTION</u>

1.   Lead Plaintiff brings this federal securities class action on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Alexandria securities between January 30, 2024 and December 5, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), against the Company and certain of its top officials.

---

[1] Emphases are added to quotations herein, unless noted otherwise below.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

2.     Alexandria is a real estate investment trust ("REIT"), founded in 1994, that focuses on owning, operating, and developing properties in the life science industry that it rents out to tenants. The Company describes itself as having "pioneered the life science real estate niche" and providing the "largest, highest quality laboratory platform."

3.     A key financial metric for the Company is whether its properties have suffered "impairments" by losing value as compared to the amounts that the Company carries for them on its books. This issue was especially important to Alexandria because it highlighted to investors that it had a very strong balance sheet as result of its self-funding disposition strategy whereby it funds its operations and development of new properties through the sale of properties that it already owns. The Company calls this "asset recycling" and repeatedly told investors that it carried this out by selling properties that were not part of its "Megacampus" strategy.

4.     During the Class Period, there were concerns in the commercial real estate industry of oversupply and lowered demand, but Defendants insistently told investors that Alexandria was able to withstand these issues because of the strength of its properties and its self-funding disposition strategy. In reality, however, Alexandria's properties suffered significant impairments that required it to sell many more properties than previously expected, including Megacampuses, for substantial losses. When the Company announced these impairments toward the end of 2025, Defendants tried to conceal the extent to which they came from Megacampuses. But a close comparison of how Alexandria described these impaired properties to how it listed them in other disclosures reveals that many more were actually part of Megacampuses than Defendants were willing to admit.

5.     In total, the Company took an extraordinary $2.2 billion in impairments in 2025, as compared to just $223 million in 2024. Nearly this entire amount was not disclosed until the Company surprised the market when it announced its results for the

2

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case
No. 2:25-CV-11319-GW (AGRX)

third quarter of 2025 on October 27, 2025, which included approximately $324 in impairments, followed by its Investor Day on December 3, 2025, when it announced an additional $1.3 billion in impairments, and added even more impairments when it announced its final results for the year.

6.    Multiple sources show that Alexandria was required to take these impairments much earlier.

7.    A confidential witness that worked in the Company's New York office ("CW 1") described a meeting that Defendant Marcus attended where he decided *by early 2024* to sell the Company's property in Long Island City that it did not take a $206 million impairment on until October 27, 2025.

8.    It was also clear by that time that the Long Island City Property was worth far less than the Company disclosed. CW 1 described how much difficulty the Company was having leasing out that property leading up to Marcus's decision to sell it. Indeed, Defendant Binda admitted that the Long Island City Property "never recovered" after "Amazon abandoned its plan for new HQ in that location in 2019." Moreover, the Company sold an adjacent property that was part of the same development for a substantial loss in December 2023.

9.    Abundant evidence also shows that the other properties that the Company did not recognize as impaired until the end of 2025 were in fact impaired much earlier. When Alexandria announced these impairments, it acknowledged that macro-economic factors relating to supply and demand that had existed for years hurt these properties. That was a very different position than what Defendants told investors during the Class Period, when they assured that the Company was able to withstand such pressures because of the quality of its properties and its disposition strategy.

10.    Other evidence confirms that the Company's impaired properties were suffering all along. Based on analysis from a real estate valuation expert that Lead

3

Plaintiff has retained, proprietary property-specific data shows that the Company's Megacampus in San Francisco that it took a $208 million impairment on was already suffering substantial distress that the Company did not disclose. This analysis is based on property-specific data containing indicators that this particular property, as well as others in the market, were experiencing effectively lower rents and tenant demand in ways that did not appear in publicly reported prices and occupancy figures. This includes significant concessions made in direct leases to tenants, substantial subleasing activity reflecting lower prices, increased supply and lower demand, limited leasing activity, and competition from other properties that were performing better than the Company's Megacampus.

11. Alexandria also conceded that other impairments were based on factors that were present all along. For example, the largest impairment, of $335 million, was to another property in San Francisco that sat undeveloped since its anchor tenant terminated its lease in 2020.

12. The sheer scale of the Company's impairments is also telling. It is not plausible that the Company had only $223 million in 2024, $162 million in impairments during the first half of 2025, and then *over $2 billion* in impairments for the remainder of the year that it first started announcing on October 27, 2025.

13. Under Generally Accepted Accounting Principles ("GAAP") for the recognition of impairments on real estate, which Alexandria committed to following, the Company was required to recognize these impairments much earlier, as the analysis of Lead Plaintiff's accounting expert shows. The Company tried to hide behind its categorization of these properties as purportedly "held and used" rather than "held for sale" until the end of 2025. There are multiple flaws with that approach, each of which provides an independent reason for why the Company violated GAAP. *First*, even if the properties were categorized as "held and used," if the Company was even considering

4

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

selling them, it was required to account for the lower price they would fetch under a "probability-weighted approach." The allegations here strongly support the inference that the Company was at least planning to sell these properties long before the end of 2025. ***Second***, revenue that these properties could be expected to generate even if the Company planned to continue to hold them could not possibly justify their prior values given all of the difficulties that they faced. ***Third***, the Company improperly delayed in categorizing the properties as "held for sale" when the allegations shows that it had a concrete plan to sell them before the third quarter of 2025.

14.     When Alexandria eventually announced its substantial impairments starting on October 27, 2025, the Company's stock price fell drastically, dropping over 27% between October 28 and October 30, and falling over 15% between December 3 and December 5, 2025. Investors had such a strong reaction because the massive impairments derailed the Company's business plan and had enormous implications for its financial results.

15.     The losses that the Company suffered from these impairments caused its earnings for 2025 to reverse direction from a gain of $0.50 per share to a loss of $8.58 per share. The impairments also harmed the Company's performance going forward. Because the impaired properties were worth so much less than previously disclosed, Alexandria was not able to execute its disposition strategy of raising sufficient funds from its asset sales and was forced to significantly cut its dividend that investors depended on so much to compensate for that loss in funding. Additionally, because the Company would be receiving so much less for the sale of the impaired properties than it previously disclosed they were worth, it was forced to sell many more properties—and properties that were much more central to its business plan—than previously expected. This substantially decreased the Company's asset base, diminished its earnings potential, and further reduced its ability to support its dividend in the years to come.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

## II.   JURISDICTION AND VENUE

16.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.   Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Alexandria is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

19.   In connection with the acts and omissions alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

20.   Lead Plaintiff Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., and Menora Mivtachim Vehistadrut Hamehandesim Nihul Kupot Gemal Ltd., as set forth in their previously filed Certifications (ECF Nos. 31-3, 31-4, 31-5), acquired Alexandria securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

21.   Defendant Alexandria Real Estate Equities, Inc. is a California corporation with its principal executive offices located at 26 North Euclid Avenue, Pasadena, CA 91101. The Company's common stock traded in an efficient market on the New York Stock Exchange ("NYSE") under the symbol "ARE" during the Class Period.

22.   Defendant Joel S. Marcus has served as Alexandria's Executive Chairman and Founder throughout the entire Class Period. Prior to April 2018, Marcus served as

6

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

Alexandria's Chairman, Chief Executive Officer and President. Marcus co-founded Alexandria in 1994.

23.     Defendant Peter M. Moglia has served as Alexandria's Chief Executive Officer since July 2022 and as Alexandria's Chief Investment Officer since September 2023. Prior to that, Moglia served as Alexandria's Co-Chief Executive Officer from April 2018 to July 2022 and as Alexandria's Co-Chief Investment Officer from May 2018 to September 2023. Moglia also served as Alexandria's Chief Investment Officer from January 2009 to April 2018 and has been with the Company since April 1998.

24.     Defendant Marc E. Binda has served as Alexandria's Chief Financial Officer since September 2023 and as Alexandria's Treasurer since April 2018. Prior to that, Binda served as Executive Vice President – Finance and Treasurer from June 2019 to September 2023 and Alexandria's Senior Vice President – Finance and Treasurer from April 2018 to June 2019. Binda also served as Senior Vice President – Finance from April 2012 to April 2018 and has been with the Company since January 2005.

25.     Defendant Hallie E. Kuhn, PhD served as Alexandria's Senior Vice President - Co-Lead - Life Science & Capital Markets from April 2024 to December 2025. Prior to that, Kuhn served as Alexandria's Senior Vice President - Science & Technology/Capital Markets from July 2022 to April 2024 and as Alexandria's Principal – Head of ARE LaunchLabs – Pasadena from January 2019 to March 2023. Kuhn currently serves as Alexandria and Alexandria Venture Investments' Executive Vice President – Capital Markets & Co-Lead - Life Science after assuming the role in January 2026.

26.     Defendant Hunter L. Kass has served as Alexandria's Co-President and Regional Market Director – Greater Boston since September 2023. Prior to that, Kass served as Alexandria's Executive Vice President – Regional Market Director – Greater Boston from January 2021 to September 2023 and as Alexandria's Senior Vice President

7

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

– Strategic Market Director – Greater Boston from October 2019 to January 2021. Kass has been with the Company since 2018.

27. Defendants Marcus, Moglia, Bind, Kuhn, and Kass are referred to collectively as the "Individual Defendants." The Individual Defendants and Alexandria are referred to collectively as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    The Company's Business Model

28. Alexandria is a real estate investment trust ("REIT"), founded in 1994, that focuses on owning, operating, developing, and leasing out properties in the life science industry, as well as related industries, such as biotechnology and pharmaceuticals. The Company describes itself as having "pioneered the life science real estate niche" and providing the "largest, highest quality laboratory platform."

29. As of December 31, 2023, Alexandria had an asset base of 73.5 million square feet, including 42 million rentable square footage ("RSF") of operating properties, 5.5 million RSF of properties undergoing construction or expected to commence construction in the next two years, 2.1 million RSF of priority anticipated development and redevelopment projects, and 23.9 million square feet ("SF") of future development projects.

30. The Company focuses on properties in North America, including the Greater Boston, the San Francisco Bay Area, New York City, San Diego, Seattle, Maryland, and North Carolina Research Triangle markets.

31. Alexandria is also focused on what it calls its "Megacampus" strategy. As of December 31, 2023, Alexandria's Megacampuses accounted for 75% if its annual rental revenue ("ARR").

32. The Company's "Mega campuses are cluster campuses that consist of approximately 1 million RSF or more, including operating, active

8

development/redevelopment, and land RSF less operating RSF expected to be demolished." According to Alexandria, "[d]espite a recent increase in the availability of laboratory space," as of the end of 2023, the Company was "expected to continue to benefit from our focus on" its Megacampus strategy that involved "Class A/A+ assets strategically clustered in life science, agtech, and advanced technology mega campuses in innovation cluster locations in close proximity to top academic medical institutions" in the geographic areas that the Company focused on.

33.    Alexandria explained that "[t]his proximity [to top academic medical institutions] is a key driver of tenant demand. Our campuses are used in two distinct ways: (i) to house the research operations of our tenants, and (ii) to recruit and retain the best talent available from a limited pool, which underscores why the scale, strategic design, and placement our mega campuses provide are critical." In addition, according to the Company, "our external growth strategy focuses on creating new and enhancing existing mega campuses, which represent our strongest defense against competitive supply. Over the past three decades, we have established a significant market presence in AAA innovation cluster locations. Our mega campuses provide a comprehensive solution to life science tenants, one that is challenging to replicate due to the significant time and capital required to replicate this model."

### B.    Alexandria's Disposition Strategy

34.    At the start of the Class Period, Alexandria described itself as very well positioned for a difficult market. Defendant Marcus explained on the Company's earnings call for the fourth quarter of 2023, held on January 30, 2024, the first day of the Class Period, that "I'd say we have witnessed the unprecedented eight-year bull run of the life science capital markets [from] 2014 through 2021, the longest on record, coupled with the rocket ship funding during COVID. And the market in 2023 has clearly reflected the rationalization of the past decade."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

35.    Similarly, Defendant Moglia explained on that call that the Company was facing "a polycrisis, encompassing the confluence of economic turbulence, climate change, deeply fractured politics, two global wars, threats to democracy, loss of trust in institutions, and continuing dislocations triggered by the COVID epidemic."

36.    But Defendants described the Company as performing well in that difficult market, with Marcus "characterize[ing] our 2023 overall operating and financial performance as highly resilient," including "[n]otable achievements." Moglia promoted "Alexandria's solid 2023 performance within such a dismal backdrop is nothing less than extraordinary. I don't want to steal too much of Mark's thunder, but leasing close to our average volume since 2018 ex the rocket ship years and maintaining strong earnings growth, while navigating through this polycrisis is a testament to Alexandria's competitive advantage and the power of our brand."

37.    Defendants characterized Alexandria as well positioned to continue to grow in the nascent life science industry. Moglia stated on the Q4 2023 earnings call, "[h]eading into 2024, the polycrisis remains, but so does our resiliency. Our balance sheet is as strong as ever. And in 2023, we proved that we can self-fund our investments and still maintain our lowest leverage level in history." At the Company's 2024 investor day, held on November 29, 2023, Defendants promoted Alexandria as being at the "vanguard and heart of the $5 trillion secularly growing life science industry," with the Company being the "leader in life science real estate." The Company also described itself as "well positioned" for the "highly volatile macroeconomic environment" in 2023 and 2024.

38.    Key to the Company's strategy was its maintaining a "fortress balance sheet" by "self funding" its further growth through its "capital self-sufficiency."[2] As the Company explained in its 2023 Annual Report, "[o]ur strong and flexible balance sheet and prudent balance sheet management are key factors in our ability to navigate economic

---

[2] 2023 Investor Day Presentation.

10

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

uncertainties and capitalize on new opportunities." Alexandria expected to achieve this through its "ability to self-fund a large portion of our capital requirements." The biggest component of this "self-funding" strategy entailed the Company raising funds by selling off certain of its properties.

39. This "disposition" strategy has been an essential component of Alexandria's business model in recent years. The 2023 Annual report touted the Company's successful "[e]xecution of our value harvesting and asset recycling 2023 self-funding strategy." In particular, "[o]ur 2023 capital plan included $1.4 billion in funding primarily from dispositions and partial interest sales."

40. Defendants referred to the Company's disposition of assets as "value harvesting and asset recycling" because it focused on selling "dispositions of 100% interest in properties not integral to our mega campus strategy." In 2023, $1.042 billion of the Company's $1.315 in dispositions fell into this category.

41. Similarly, Alexandria stated in its 2024 Annual Report that it "Successfully executed our 2024 capital strategy, driven primarily by strategic dispositions" that included "$1.4 billion in funding from strategic dispositions." The report also stated that "[w]e expect to continue pursuing our strategy to fund a significant portion of our capital requirements for the year ending December 31, 2025 with dispositions and sales of partial interests primarily focused on sales of properties and land parcels not integral to our Megacampus strategy." For 2025, Alexandria "expect[ed] real estate dispositions and sales of partial interests in real estate assets to range from $1.2 billion to $2.2 billion," with a midpoint of $1.7 billion.

42. Defendants emphasized repeatedly that this disposition strategy entailed selling high-quality assets that were not essential to Alexandria's Megacampus strategy.

11

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

The Company also planned to shift toward its Megacampus strategy even further by going from 76% Megacampus ARR in 2024 to 90% Megacampus ARR in 2029[3]:



### C.   Alexandria's Extraordinary Real Estate Impairments

43.   A key financial metric for the Company is the amount by which its real estate is "impaired." Impairments to Alexandria's real estate means that those properties are worth less than the Company previously disclosed to investors. Such impairments are particularly important in the context of the Company's self-funding disposition strategy because if properties are impaired, that means that Alexandria is not able to raise as much funds from them as previously disclosed.

---

[3] 2024 Investor Day Presentation, Slide 105.

12

44. From 2022 through 2024, Alexandria recognized real estate impairments of approximately $65 million, $461 million, and $223 million:

| | Total Dispositions and Sales of Partial Interests | Gains on Sales of Real Estate | Consideration in Excess of Book Value | Real Estate Impairment | Capitalization Rates[1] | Capitalization Rates (cash basis)[1] |
|---|---|---|---|---|---|---|
| 2022 | $ 2,222,296 | $ 537,918 | $ 644,029 | $ 64,969 | 4.5% | 4.4% |
| 2023 | $ 1,314,414 | $ 277,037 | $ 7,792 | $ 461,114 | 6.7% | 5.9% |
| 2024 | $ 1,382,453 | $ 129,312 | $ — | $ 223,068 | 7.7% | 6.5% |

(1) Capitalization rates are calculated only for stabilized operating assets sold. Refer to "Capitalization rates" under "Definitions and reconciliations" in Item 7 for additional information.

45. Defendants told investors that Alexandria expected its impairments in 2025 to be consistent with these prior years. On the Company's earnings call for the fourth quarter of 2023, held on the first day of the Class Period in January 2024, an analyst from Wells Fargo raised the Company's recent impairments and asked whether the Company would "see more impairments netting" out investment gains. In response, Defendant Binda acknowledged that "We did have some impairments during the quarter here" (which came out to $271.9 million), but assured that "over a longer period, when we look back, the impairments have been pretty modest relative to the size of those gains." In other words, Defendant Binda described the $271.9 million in impairments from the fourth quarter of 2023 as larger than what the Company expected "over a longer period."

46. Defendants then continued to avoid disclosing the true nature of Alexandria's impairments. On the Company's earnings call for the second quarter of 2024, held on July 23, 2024, an analyst from Wedbush asked if funding the Company's new developments through dispositions of its current assets "expose yourself to impairments in this market"? In response, Defendant Marcus did not address impairments at all, and instead focused on the benefits of the Company's Megacampuses. He explained that given the current "way more disciplined allocation of capital from the life science industry, more and more, it's clear to us, it's been clear for a long time, but even more so today, that the best prospects for leasing and either keeping a tenant or attracting a new tenant is to give them great optionality on a mega campus, great amenities and . . . that's

13

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS: Case No. 2:25-CV-11319-GW (AGRX)

where we want to refocus or double down our efforts and we've gone a long way to . . . bring that to reality." Rather than discussing impairments, he framed the Company's disposition strategy as aiming to "have fewer and fewer non-core assets." Defendant Moglia similarly emphasized that the assets that the Company would be selling through its dispositions were "those noncore, non-mega campus assets," without even mentioning impairments.

47. In 2025, however, Alexandria recognized an extraordinary $2.2 billion in real estate impairments, many times more than the amount of impairments from the prior years:

| | Aggregate Sales Price of Dispositions and Sales of Partial Interests | Impairment of Real Estate | Capitalization Rates[1] | Capitalization Rates (Cash Basis)[1] |
|---|---|---|---|---|
| 2023 | $ 1,314,414 | $ 461,114 | 6.7% | 5.9% |
| 2024 | $ 1,382,453 | $ 223,068 | 7.7% | 6.5% |
| 2025 | $ 1,813,778 | $ 2,202,818 | 7.7% [2] | 7.5% [2] |
| Midpoint of 2026 guidance range | $ 2,900,000 | | [3] | |

48. These $2.2 billion in impairments included over $1.7 billion that was not recognized until the final three months of 2025. The Company shoehorned into this figure "impairment charges aggregating $910.7 million related to assets classified as held for sale as of December 31, 2025," with an aggregate book value of $581.7 million, that the Company "committed to dispose in 2026."

49. This brought the Company's total disposition of assets to over $1.8 billion in 2025 and to an estimated $2.9 billion in 2026.

50. Alexandria began confessing to its inordinately large impairments when it reported its results for the third quarter of 2025, on October 27, 2025. The Company recognized $323.9 million in impairment charges, including an impairment charge of $206.2 million for the Company's 179,100 RSF property in Long Island City, New York (the "Long Island City Property"), reducing its estimated fair value to approximately $31.1 million. This was an 87% reduction in the value of the property. According to Alexandria, the Long Island City Property first "met the held for sale criteria in September

14

2025, when we committed to dispose of it following our reevaluation of its alignment with our Megacampus strategy and decided to allocate sales proceeds toward other projects with higher value-creation opportunities. As of September 30, 2025, the property is 52% occupied."

51. The Company further announced on October 27, 2025, that it faced "potential additional impairments of real estate (including impairments on stabilized and non-stabilized properties and land) that may be recognized during the three months ending December 31, 2025, ranging from $0 to $685 million, related to assets that could potentially be sold in the fourth quarter of 2025 or 2026, and if such assets meet the held for sale criteria during the three months ending December 31, 2025, considering market factors, buyer ability to perform, our desire to proceed with a sale at a particular price, and other factors." All of these impairments caused the Company to *reduce its 2025 earnings guidance by $3.44 per share, swinging from a gain of $0.50 in net income to a net loss of $2.94*.

52. On the earnings call that accompanied these financial results announced on October 27, 2025, Defendant Binda foreshadowed the Company's need to cut its dividend, stating that "[g]iven the factors that we described in our press release that are expected to impact 2026 earnings and cash flows, we anticipate that our Board of Directors will carefully evaluate future dividend levels accordingly." Defendant Marcus also acknowledged that the Company could use "savings on dividend" as a source of capital.

53. Alexandria had previously treated its dividend as sacrosanct, supported by its stable revenue stream and ability to fund its operations through its disposition strategy. The sudden need to consider cutting its dividend was a direct result of the newly announced impairments that made far less cash available from the sale of assets that were now worth at least hundreds of millions of dollars less than previously disclosed.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

54.    Then, on December 3, 2025, in connection with Alexandria's 2025 Investor Day, the Company disclosed that "[s]ubsequent to October 27, 2025, and as of December 3, 2025, . . . we recognized impairment charges with our share aggregating approximately **$1.3 billion**. This amount comprises approximately **$685 million of impairment charges previously disclosed as potential 4Q25 impairments**, as discussed above, and approximately **$588 million of additional real estate impairments** primarily related to the disposition targets identified after October 27, 2025 and approved for sale by December 3, 2025, with expected sales completion in 2025 and 2026."

55.    This ***further reduced the Company's earnings guidance for 2025 by $5.64***, from a loss of $2.94 per share previously announced on October 27, 2025, to a loss of $8.58 per share, "primarily to reflect additional real estate impairments aggregating $588 million." Also on Investor Day 2025, ***the Company reduced its dividend by 45%***, from $1.32 per share for 3Q25 to just $0.72 per share for 4Q25, to "conserve $410 [million] of capital." This significant decrease in the Company's dividend was a direct result of the Company (1) needing to save money because it was raising fewer funds from its asset sales as a result of the impairments and (2) having a diminished asset base for future revenue as a result of its needing to sell more properties than expected because the impairments meant that each sale would provide substantially fewer funds than previously disclosed.

56.    Alexandria announced impairments to the following properties that comprised the Company's $1.3 billion in additional real estate impairments announced on December 3, 2025:

- Impairment charge of **$335.0 million** was recognized to reduce the carrying amount of a future development project aggregating 1.1 million SF, which represents our sole remaining asset in the SoMa [the South of Market submarket of San Francisco] submarket, to its

16

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

estimated fair value of approximately $75.0 million less costs to sell.[4] We acquired this asset in January 2017, with the intent to develop the property for laboratory and/or advanced technology space. In March 2019, we executed a build-to-suit lease with an anchor tenant, Pinterest, Inc. In August 2020, we received an $89.5 million lease termination payment from Pinterest, Inc. upon termination of its lease prior to commencement of development. Management's decision not to proceed with the project was due to the macroeconomic outlook and our strategy to recycle capital into projects with greater value-creation potential. This asset has been entitled for residential use and we have commenced a program to market this property to residential developers.

• Impairment charge of **$208.0 million**, representing our share, was recognized to reduce the carrying amounts of seven properties owned by our consolidated real estate joint venture at a Megacampus in our South San Francisco submarket, to their estimated fair values aggregating approximately $282.0 million less costs to sell.[5] As of September 30, 2025, we hold a 50% ownership interest in six of these properties and a 51% interest in the remaining property. The decision to sell these certain Megacampus assets followed a reevaluation of the project's financial outlook and the capital required to lease vacant space and redevelop certain properties, leading to our strategic decision to reinvest the sales proceeds toward other projects with greater value-creation opportunities.

• Impairment charge of **$150.0 million**, representing our share, was recognized to reduce the carrying amount of multiple land parcels aggregating 1.0 million of future development RSF owned by a consolidated real estate joint venture in our Seaport Innovation District submarket, to their estimated fair values aggregating approximately $33.5 million less costs to sell.[6] As of September 30, 2025, we hold a 60% ownership interest in the land parcels. These industrial- and retail-

---

[4] This made the impairment amount to approximately 82% of the property's prior disclosed value.

[5] This made the impairment amount to approximately 42% of the property's prior disclosed value.

[6] This made the impairment amount to approximately 82% of the property's prior disclosed value.

17

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

zoned land parcels were originally acquired with the intent to develop laboratory space. The decision not to proceed with the project reflects a lack of tenant demand for laboratory space in the Seaport Innovation District submarket, and our strategy to recycle capital into projects with greater value-creation potential.

- Impairment charge of **$145.0 million** was recognized to reduce the carrying amount of one operating office property and land parcel aggregating 478,000 SF in our Greater Stanford submarket, to their estimated fair values aggregating approximately $140.0 million less costs to sell.[7] We acquired these assets in 2019 with the intent to redevelop them for life science use. However, following a reassessment of the project's financial outlook and the significant capital required, we commenced a program to market this site to residential developers.

- Impairment charge of **$107.0 million** was recognized to reduce the carrying amounts of 10 non-Megacampus properties aggregating 788,146 RSF, located in our Canada market, to their estimated fair values aggregating approximately $142.5 million less costs to sell.[8] This decision reflects our assessment that the next phase of value creation for these assets would require significant capital investment to generate leasing activity, our strategic decision to reinvest the sales proceeds toward other projects with greater value-creation opportunities, as well as our decision to exit the Montreal submarket. The disposition of these properties will represent our complete exit from the Montreal submarket, leaving us with only one remaining asset in the Canadian market. This disposition does not represent a strategic shift and therefore does not meet the criteria for classification as a discontinued operation.

- Impairment charge of **$105.0 million** was recognized to reduce the carrying amount of a redevelopment project under construction as of September 30, 2025, aggregating 104,956 RSF in our Cambridge submarket, to its estimated fair value of approximately $70.0 million

---

[7] This made the impairment amount to approximately 51% of the property's prior disclosed value.

[8] This made the impairment amount to approximately 43% of the property's prior disclosed value.

18

less costs to sell.[9] This asset was originally acquired with the intent to expand our Alexandria Center® at One Kendall Square Megacampus, but the capital necessary to complete the redevelopment will be significant. The decision to sell this asset was driven by the project's financial outlook and the capital required to complete the redevelopment and lease the property, leading to our strategic decision to reinvest the sales proceeds, and other capital necessary to lease the property, toward other projects with greater value-creation opportunities.

- Impairment charge of **$71.5 million** was recognized to reduce the carrying amount of land parcels aggregating 1.1 million SF located in our Research Triangle submarket, to their estimated fair values aggregating approximately $41.5 million less costs to sell.[10] The decision to sell these land parcels reflects lower-than-anticipated biomanufacturing demand at this location, leading to our strategic decision to reinvest the sales proceeds toward other projects with greater value-creation opportunities.

- Impairment charge of **$68.0 million** was recognized in connection with three operating properties aggregating 148,967 RSF in our non-cluster market, reducing their carrying amounts to estimated fair values aggregating approximately $26.0 million less costs to sell.[11] These properties were originally acquired based on their proximity to Amgen, Inc., a large public biotechnology company, and with the intent of accommodating a pipeline of early-stage tenants. However, demand from these tenants has substantially declined since our acquisition. As a result, we have decided to sell these assets, and to reinvest the sales proceeds and other capital necessary to lease the properties toward other projects with greater value-creation opportunities.

---

[9] This made the impairment amount to approximately 60% of the property's prior disclosed value.

[10] This made the impairment amount to approximately 63% of the property's prior disclosed value.

[11] This made the impairment amount to approximately 72% of the property's prior disclosed value.

19

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

- Additional impairment charges aggregating **$83.4 million** were recognized in connection with 10 operating properties aggregating 441,100 RSF across six markets that are expected to be sold in 2025 and 2026. These impairments reduced the carrying amounts of these assets to their estimated fair values aggregating approximately $128.3 million less costs to sell. All but one of these properties are located outside of a Megacampus ecosystem, and their disposition aligns with our strategy to recycle capital into projects with greater value-creation potential.[12]

57. The properties that Alexandria disclosed as impaired on October 27, 2025 and December 3, 2025 are referred to collectively as the "Impaired Properties."

**D.    The Impaired Properties Included Megacampuses That Diverged From Alexandria's Disposition Strategy**

58. Defendants previously described Alexandria's disposition strategy as focused on high-quality assets that were not part of its Megacampuses. While they tried to portray the Impaired Properties as in line with that strategy, these properties included a significant amount of Megacampuses which reflected a drastic shift in the Company's disposition strategy.

59. The Company admitted in its December 3, 2025 disclosure that three of the Impaired Properties were part of its Megacampuses, including the $208 million impairment in its South San Francisco submarket, $105 million impairment of its redevelopment project in its Cambridge submarket, and one of the ten operating properties that constituted its $83.4 million impairment.

60. Further analysis reveals that other Impaired Properties were also previously part of Alexandria's Megacampuses, although the Company omitted that description when it announced the impairments. Alexandria had previously characterized its SoMa (in San Francisco) property that incurred a $335 million impairment, its properties in its Seaport Innovation District (in the Greater Boston area) that incurred a $150 million

---

[12] This made the impairment amount to approximately 39% of the property's prior disclosed value.

20

impairment, and its North Carolina Research Triangle properties incurring a $71.5 million impairment as all part of its Megacampus strategy. The Company, notably, did not describe these properties as "non-Megacampus" properties as it did for certain other Impaired Properties.

61. While Alexandria's disclosure of the Impaired Properties provided scant property-specific detail, a close analysis of how these properties are described in other disclosures shows that they were part of the Company's Megacampus strategy.

62. In particular, Alexandria's 2024 Annual Report (and prior annual reports) referenced the Company's "Megacampus: 88 Bluxome Street/SoMa," "Megacampus: 285, 299, 307, and 345 Dorchester Avenue/Seaport Innovation District," and multiple Research Triangle Megacampuses.

63. Other Company filings confirm that these Megacampuses are included in the Impaired Properties. The Company's 2020 Annual Report stated that its rental revenues increased by $306.1 million in 2020, as compared to 2019, in part based on "a termination fee of $89.5 million recognized in connection with the termination of our contract for a future lease at our development project at 88 Bluxome Street in our SoMa submarket during the three months ended September 30, 2020." This plainly references the "Megacampus: 88 Bluxome Street/SoMa" noted above and aligns with the Company's description on December 3, 2025, of the $335 million impairment to the SoMa property.

64. Similarly, the Company's 2025 Annual Report, filed on January 26, 2026 (after the Class Period), describes under "[s]ales of real estate assets and impairment of real estate," the sale of "285, 299, 307, and 345 Dorchester Avenue (consolidated JV)" in the Seaport Innovation District/Greater Boston, on December 30, 2025, for a sale price of $33.5 million, with 1.04 million square footage in and land and future. This too aligns with the Company's prior description of its "Megacampus: 285, 299, 307, and 345

21

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

Dorchester Avenue/Seaport Innovation District" and its description on December 3, 2025, of the $150 million impairment to Seaport Innovation District land parcels.

65.     The Company's 2025 Annual Report also references a Research Triangle land parcel at 3029 East Cornwallis Road that was sold on December 31, 2025, containing 600,000 square feet for future development and a sale price of $29.5 million.[13] The Company's 2024 Annual Report references this specific property as part of the "Megacampus: Alexandria Center® for NextGen Medicines/Research Triangle" containing a book value of $109.368 million and 1.055 million square feet of future opportunities. This aligns with the Company's description on December 3, 2025 of its "[i]mpairment charge of $71.5 million" on "land parcels aggregating 1.1 million SF located in our Research Triangle submarket," though by the 2025 Annual Report, the impairment had increased to $82.5 million for just a portion of that land.[14]

66.     In sum, of the $1.3 billion in impairments that the Company announced on December 3, 2025, over $870 million was therefore from its Megacampus strategy. Indeed, despite the Company disclosing at its Investor Day in December 2024 that it planned to shift from 76% Megacampus ARR in 2024 to 90% Megacampus ARR in 2029, by its Investor Day in December 2025, when it announced its massive impairments, it had increased its Megacampus ARR only one percent, to 77%.[15]

---

[13] This indicates that only part of the property was sold in 2025, with the remainder to be sold in 2026, because the Company previously described impairment charges on land parcels located in the Research Triangle aggregating 1.1 million square feet.

[14] In addition, one of the Impaired Properties that the Company announced on October 27, 2025, included a $31.8 million impairment to a separate Research Triangle property that the Company described as a "vacant property aggregating 104,531 RSF in the Research Triangle" that it was selling "due to its noncontiguous location relative to most other properties on the Alexandria Center® for Sustainable Technologies Megacampus." In other words, the Company previously considered this property part of the Alexandria Center® for Sustainable Technologies Megacampus.

[15] Investor Day 2025, Slide 107.

22

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

67.    Rather than being a result of Alexandria's purported strategy to shift more toward its Megacampus strategy, in reality, its disposition of properties at the end of 2025 was a result of major impairments across the board, including both Megacampuses and other properties. This extreme shift in the Company's disposition strategy had major negative ramifications for its financial results because it meant that the Company would (1) suffer substantial losses in 2025 as a result of the impairments, (2) not be able to raise as much funds as needed from its property sales because they were worth so much less than previously disclosed, and (3) reduce its asset base for future revenues because it needed to sell more revenue-producing properties, including those that were part of its Megacampus strategy, to compensate for the impairments that meant each property provided less funds than previously disclosed.

### E.    The Impaired Properties Were Impaired Far Earlier Than the Company Disclosed

#### a.    The Company's Disclosure of the Impaired Properties Admitted That They Were Impaired Much Earlier

68.    Alexandria's surprising disclosure of the Impaired Properties on October 27 and December 3, 2025, ascribed the impairments to challenges that occurred years in the past.

69.    The Company disclosed that the Long Island City Property was only 52% occupied at the time of its impairment on October 27, 2025. Furthermore, as Defendant Binda explained on the accompanying conference call, "we acquired the site in 2018. That submarket suffered *a substantial setback when Amazon abandoned its plan for new HQ in that location in 2019 and it never recovered*." He also stated that the area never became one to attract "a critical mass of life science tenants" and the "location has become more of an industrial flex and cinema submarket rather than life science."

70.    In addition, when Alexandria disclosed its $1.3 billion in additional impairments on December 3, 2025, it stated that it was not proceeding with (1) the SoMa

23

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

project that incurred a $335 million impairment "due to the macroeconomic outlook," (2) the South San Francisco Megacampus due to "a reevaluation of the project's financial outlook," (3) the Seaport Innovation District property due to "a lack of tenant demand for laboratory space in the Seaport Innovation District submarket," (4) the Greater Stanford properties "following a reassessment of the project's financial outlook," (5) the Cambridge property due to "the project's financial outlook," (6) the North Carolina Research Triangle due to "lower-than-anticipated biomanufacturing demand," (7) and another property because "demand from" the Company's anticipated "tenants has substantially declined since our acquisition" based on the property's "proximity to Amgen." While in some cases, the Company also noted the amount of capital required to develop certain projects as a reason to sell them, that reason does not stand alone because the Company's entire business model is based on its investment of capital to develop projects for its tenants. Alexandria was not willing to make the necessary capital investments because of the weak demand for these properties. Indeed, the Company admitted that it planned to "recycle capital into projects with greater value-creation potential."

71.     In fact, the status of the SoMa property containing the largest impairment of the Impaired Properties, of $335 million, had not changed since August 2020, when the Company's prior tenant paid $89.5 million to terminate its lease.

72.     Defendants also finally admitted when it revealed the Impaired Properties, other factors that were present earlier that made these properties troubled. The Company's 2025 Investor Day presentation, disclosed on December 3, 2025, described 2025 as "THE FIFTH YEAR OF A BROAD-BASED BIOTECH BEAR MARKET." This resulted from a "UNIQUE PANDEMIC-ERA SUPPLY SURGE" under which "life science real estate availability has grown 7.5x since 2021," "LIFE SCIENCE REAL ESTATE AVAILABILITY HAS GROWN 7.5X SINCE 2021," and the "[h]igher [c]ost of [c]apital

24

in the [p]ublic markets."[16]  But all of these factors were already present at the beginning of the Class Period in January 2024, when Defendants touted the Company's ability to perform well as the "vanguard and heart of the $5 trillion secularly growing life science industry." For example, while the Company described on December 3, 2025, that supply surged "7.5x since 2021," it showed market inventory and availability increasing only slightly, and demand decreasing only slightly, in the first three quarters of 2025, as compared to much larger increases from 2021 to 2024:



73.    Similarly, over 52% of the 62% decrease in demand that the Company cited at the 2025 Investor Day had already taken place by 2023:

[16] 2025 Investor Day, Slides 5, 7-9.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

74.    In contrast, to these downbeat descriptions at the end of 2025, when Defendants previously discussed negative macroeconomic conditions during the Class Period, they touted Alexandria's ability to withstand them based on the strength of its properties, its Megacampus strategy, and the dynamics of the bio-tech industry.

75.    Defendants even specifically denied throughout the Class Period that concerns about macroeconomic conditions, such as supply and demand in the market, were negatively impacting the Company. They instead highlighted Alexandria's purported competitive advantages and benefits of the life science industry, maintaining that even with increased supply or lower demand, tenants would choose Alexandria's properties over those of its competitors because of the supposedly superior quality of the Company's properties.

76.    Defendants also falsely promoted throughout the Class Period that the Company's disposition strategy through its asset recycling program, whereby it funded

26

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

its development by selling properties, was part of its focus on Megacampuses. Defendants represented that the properties the Company was selling were strong and that they were being sold just because they did not fit into the Company's Megacampus strategy.

77. For example, Defendant Marcus specifically rejected an analyst's suggestion that selling properties would improve the quality of the Company's portfolio, stating on an earnings call on October 22, 2024, "I don't think you could say the quality of the portfolio is going to be substantially improved. It is already first in class, best assets, best location, best services, best tenants. So I don't think how you're thinking about that is quite correct." Rather, he explained, "[w]e have a variety of assets, land, redevelopments, and developments that no longer fit the mega campus strategy, and we'll harvest those assets over the coming years." Moglia added, "we feel like all the assets we have are good assets, but … we deem some of them to no longer be part of our strategy, and … those are the ones that we're selling in order to fund our pipeline."

78. In support of this approach, the Company's presentation from its earnings announcement for the fourth quarter and full year of 2024, made on January 27, 2025, highlighted its "Strong Execution of Capital Recycling Strategy," noting it had $2.9 billion in net gains from the "strategic dispositions" of assets from 2019 through 2024:

27

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)



79. In fact, however, the billions of dollars in properties that the Company announced it was selling at the end of 2025 were driven by the $2.2 billion in impairments that the Company suffered that year, which derailed its development strategy. That was drastically different than the "asset recycling" disposition strategy that Alexandria promoted previously.

80. Furthermore, Alexandira consistently promoted the strength of its dividend based on its dependable cash flows right up until it surprised the market in the third quarter of 2025 (on October 27, 2025) by noting that it would need to revisit its dividend, which it proceeded to cut substantially.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

81.    Even in the results for second quarter of 2025, announced on July 21, 2025 just before the Company began revealing the Impaired Properties, the Company highlighted "Alexandria's Historically Consistent and Solid Dividends" that grew every year from 2021 through 2025 based on the $2.3 billion in "[n]et [c]ash [p]rovided by [o]perating [a]ctivities [a]fter [d]ividends":



82.    All of these statements were false and misleading because Alexandria's properties suffered significant impairments, were severely hurt by market conditions, and these problems infected the gamut of the Company's properties, Megacampuses and other properties alike. The Company also could not support its dividend at previous levels because it lost $2.2 billion on the Impaired Properties.

29

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

**b. Additional Factors Show That the Impairments Were Present Earlier**

83. Additional evidence, including property-specific information, shows that the Impaired Properties were troubled all along.

### i. The Long Island City Property

84. The Company's difficulties leasing the Long Island City Property were apparent well before the Class Period. On an earnings call on July 27, 2021, responding to an analyst's question concerning leasing there, Defendant Marcus admitted that it had "been a slower lease-up than we would have wanted, partially in due to what happened with Amazon and so forth kind of put a chill on that submarket overall."

85. Defendant Marcus also tried at that time to frame the issue as being related to the New York market more broadly, stating "the reality is the demand is much less" in the New York market than what "brokers tout . . . You don't see any big companies moving to New York for obvious reasons, high taxes, governance issues to some extent. And just it's an expensive place to be. So, we're doing great at our center. But, it's a tough market. It's a heavy lift market." Moglia agreed that "it's definitely a market where we've had to almost create demand."

86. Defendants subsequently changed their tune about the New York market and acknowledged difficulties specific to Long Island City. In the Company's results for the third quarter of 2023, it started to disclose that the overall occupancy rate for the New York market of 89.4% was being brought down by the "Long Island City property that is currently 41.7% occupied." From the time the Company started disclosing the occupancy rate of the Long Island City property through the end of the Class Period, its occupancy rate never went above 52.2%.

87. The Long Island City property had such a low occupancy even despite the Company's efforts to lease it out at a substantial discount. The Company's Annual Report for 2024 shows that in 2024, it received $5.67 million in annual rental revenue on the

30

property, based on an occupancy percentage of 45.7% and 179,188 in rentable square feet. In comparison, the Company's Megacampus in Manhattan obtained $67.864 million in annual rental revenue in 2024, based on an occupancy percentage of 98.7% and 742,586 in rentable square feet. Based on these total figures, the Long Island City property was charging an average rental rate of $31.64 while the Manhattan property was charging an average of $91.39 per square foot. But even after accounting for the differing occupancy rates between these buildings, the Long Island City Property was charging significantly lower rent for the much more limited amount of space that it was able to rent out. The Long Island City Property was charging $69.24 per square foot just for the small portion of the building that it was able to rent out. The Manhattan property, in contrast, was charging $92.59 per square foot for the space it was renting out.

88.     This discrepancy existed from before the start of the Class Period through the time that the Company eventually disclosed the impairment on the Long Island City property in the third quarter of 2025. The Company disclosed in its 2023 Annual Report that in 2023, while the Long Island City property had an occupancy rate of 41.7%, annual rental revenue of $5.287 million, and 179,100 in rentable square feet, the Manhattan property had an occupancy rate of 95.8%, annual rental revenue of $67.706 million, and 743,377 in rentable square feet. Then, in the second quarter of 2025 (as of June 30, 2025)—the last quarter before the Company disclosed the impairment of the Long Island City Property—the Long Island City property had an occupancy rate of 52.2%, annual rental revenue of $5.688 million, and 179,100 rentable square feet, versus the Manhattan property that had an occupancy rate of 97.8%, annual rental revenue of $69.318 million, and 742,700 rentable square feet. The occupancy and rental figures for these properties fell in this range every quarter from before the Class Period through the Company's eventual disclosure of the impairment on October 27, 2025. In other words, the problem

31

persisted the entire time that the Company was not able to rent out the Long Island City Property in a meaningful way, even at a substantially reduced rental rate.

89.    In addition, the *Commercial Observer* (a leading commercial real estate publication) reported in January 2024 that the Long Island City Property was "70 percent vacant, currently being used by two life sciences tenants: Envisagenics, a firm that uses AI to study RNA, and RenBio, which develops antibody drugs, per CoStar."[17] The Company itself, in contrast, reported that the property was 41.7% occupied as of both December 31, 2023 and March 31, 2024.

90.    Further evidence that the Long Island City Property was impaired at the start of the Class Period is that, as *Bisnow* (another leading commercial real estate industry publication) reported, in December 2023 that Alexandria sold a smaller property adjacent to the Long Island City Property, which was "one of its two Long Island City properties, a site where it planned to develop life sciences labs" as part of a "life sciences cluster," for over 23% less than the purchase price.[18] This other property was a 52,000 square foot property that the Company purchased for approximately $25 million in 2019 and sold for $19.1 million in December 2023.[19] *Crain's New York Business* reported on this sale on January 11, 2024, that "Developer Alexandria unloads planned life sciences site in Queens at a loss," observing that "[a] plan to transform an industrial corner of Queens into a life sciences hub may have run into a roadblock."

91.    Lead Plaintiff has retained Steven Kurtz, a real estate valuation expert at the global consulting firm Alvarez & Marsal ("A&M"), who leads A&M's U.S. Real Estate

---

[17] CoStar is the leading subscription-based commercial real estate database.

[18] Ciara Long, *Alexandria Sells LIC Life Sciences Site for Loss to Film Study*, Bisnow (Jan. 12, 2024).

[19] Google Maps shows that this property, located at 47-50 30th Street in Long Island City, is directly across the street from the main Long Island City Property, located at 30-02 48th Avenue.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

practice, specializes in providing valuations for real estate and real estate-related assets, and has more than 30 years of experience doing so. He explains that, based on contemporaneous news reporting, when Alexandria acquired this smaller Long Island City property in 2019 (along with the main Long Island City Property in 2018), its investment thesis assumed sustained tenant demand, achievable lab rents, and sufficient valuation upside to justify the costs and risk of purchasing, developing, and holding the asset. Alexandria's original intent was to also convert this property to laboratory use. The property was transferred internally within the Company in January 2023, in apparent anticipation of the change in use. The fact that the Company abandoned that redevelopment and disposed of the property at a loss provides further evidence (in addition to the other factors discussed herein related to the Long Island City Property, including those discussed by CW 1 and that Alexandria admitted to) that the submarket no longer supported the Company's original laboratory conversion thesis because it reflected a fundamental mismatch between projected demand and actual market conditions. The abandonment of the Company's planned strategy for Long Island City signals that management no longer believed the market could support the intended use at an acceptable risk-adjusted return. The loss on the sale of this property is evidence that by the end of 2023, the underlying submarket fundamentals in Long Island City deteriorated to a point where the Company's original investment rationale for the main Long Island City Property was also no longer viable.

### ii.  The San Francisco Mega Campus

92.    Based on consultation with Lead Plaintiff's real estate valuation expert at A&M, proprietary data from the CoStar and Compstak commercial real estate databases show significant challenges from before the start of the Class Period, facing Alexandria's San Francisco Megacampus included in the Impaired Properties. This is the Impaired Property that Alexandria announced on December 3, 2025, for which it took a $208

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

million impairment to seven of the properties at the Megacampus (the "San Francisco Megacampus"). The Company's 2025 Annual Report reveals that this included the Megacampus properties located at 601, 611, 651, 681, 685, 701, and 751 Gateway Boulevard in South San Francisco.

93.    CoStar and Compstak are both private, proprietary databases containing extensive data on commercial real estate transactions that are not accessible to the public at large and are not understandable to those without expertise in the commercial real estate industry. This property-level proprietary information shows real-time leasing and subleasing activity, competitive positioning, concession trends, and tenant behavior within the relevant submarket.

94.    CoStar and Compstak data show that from 2021 through 2023, prior to the start of the Class Period, the San Franscisco Megacampus faced substantial subleasing activity at reduced rental rates and made leases directly to tenants that included notable concessions. This is significant because such transactions indicate reduced leasing activity at lower prices, but do not show up in the occupancy or rental rates that Alexandira reported to its investors.

95.    As Lead Plaintiff's real estate valuation expert explains, substantial amounts of subleases are commonly viewed as a sign of tenant contraction because they typically arise when an existing tenant no longer needs all or part of the space it originally leased. Since commercial leases are often long-term and difficult to terminate, tenants use subleasing as a way to reduce excess occupancy costs rather than as a growth strategy. Subleases often involve only a portion of the tenant's space and are frequently priced below the tenant's original rent because the goal is cost recovery, not profit. Discounted sublease availability directly competes with space that owners lease directly and reduces the ability of owners to achieve projected rents or absorption. High levels of discounted sublease space signal that more space is available than tenants need, indicating weak

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

demand in the market. Because sublease space is typically priced below direct lease offerings, it competes directly with space available directly from owners (including new or renovated space) and gives tenants lower-cost alternatives. This increased competition forces landlords to reduce asking rents or offer concessions, making it difficult to achieve originally projected rental rates. At the same time, the surplus of available, attractively priced space gives tenants more options and less urgency to commit, slowing the pace at which space is leased and resulting in weaker occupancy overall.

96.     The volume and pricing of subleasing and direct leasing activity at the San Francisco Megacampus from 2021 through 2023 shows declining tenant demand and excess supply. For example, Compstak shows that at **601 Gateway Blvd** (part of the San Francisco Megacampus), there was a sublease in the second quarter of 2023 of 11,846 square feet by Structure Therapeutics at $41.40 per square foot. That is at a substantial discount to the rental amounts of the Company's direct leases at the same property from 2021 through 2023, including a lease in December 2021 to Aligos Therapeutics reported by CoStar for the exact same amount of space (11,846 square feet) in December 2021 for $53.52 per square foot, representing a 22.6% discount. The four direct leases that CoStar reports for this property at 601 Gateway Blvd from 2021 through 2023 that contain prices were all for at least $46.80 per square foot, but after January 2022, none of them was for a space larger than 5,002 square feet. CoStar also reports a sublease at this building for suite 1250 that was signed in February 2023, without providing further details. Alexandria also made a direct lease at this property in 2022 to the California Institute for Regenerative Medicine for $61.20 per square foot that included a tenant improvement allowance of $50 per square foot, a major concession that effectively lowered the tenant's actual rent substantially below the official reported price.

97.     CoStar and Compstak also show significant distress from 2021 through 2023 at the other buildings in the San Franscisco Megacampus, including:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

- **685 Gateway Blvd**: no signed leases (direct or subleased) reported;

- **611 Gateway Blvd**: substantial subleasing activity in 2022 (including two in the fourth quarter for 13,670 square feet each and one in April 2022 for an unreported amount of space); only one direct lease reported that year (in December 2022) for approximately 6,000 square feet at $51 per square foot that included the significant concession of a tenant improvement allowance of $20 per square foot (effectively lowering the actual rent); and only one lease reported in 2023 (a direct lease for 5,000 square feet);

- **651 Gateway Blvd:** only 22,364 square feet leased out of 326,707 square feet total because it was undergoing renovations; and

- **701 Gateway Blvd:** only three direct leases signed spanning a total of 27,264 square feet, one of which, for 7,401 square feet in October 2023 at $51 per square foot, was for only 12 months (a very short period for commercial real estate).

98.    Rental rates from other biotech and pharmaceutical lab spaces from 2021 to 2023 from other companies in the southern San Franscico market that the San Franscico Megacampus was in, also show a substantial increase in subleasing activity and concessions (such as periods of free rent) that were offered to tenants that materially reduced effective rental rates despite relatively stable asking rents.

99.    This subleasing activity by other companies in the South San Francisco market includes a 2-year sublease at 2 Tower Place for 19,984 square foot in Q3 2023 for $66.00 per square foot by Assembly Biosciences, 32,113 square feet in South San Francisco leased to Soleil Labs for $68.40 per square foot in Q4 2023, and 4,500 square feet located in Brisbane, leased to Unity Biotechnology for $24.00 per square foot in Q3 2023, among other significant subleasing activity in the San Francisco Bay Area market more generally.

100.    Moreover, the significant concessions that owners gave to tenants shows that landlords were keeping the "sticker price" of rent stable, but quietly giving tenants much bigger discounts to convince them to sign leases. Because demand was weaker and tenants

36

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

had more bargaining power, owners offered long periods of free rent to make deals attractive without publicly lowering asking rents. Even though the advertised rental rates looked stable, those months of free occupancy mean that tenants were paying much less over the life of the lease. As a result, the actual money landlords collected (the effective rent) dropped significantly, showing softer market conditions despite rents appearing unchanged on paper. The following chart shows six examples of landlords in the South San Francisco market offering multiple months free on leases signed between 2021 and 2023, in one case with as much as 21 months free.

| Year | Property | Submarket | Deal Type | SF | Rent Basis | Rate ($/SF/yr) | Notes |
|---|---|---|---|---|---|---|---|
| 2021 | 1700 Owens St (Nurix) | Mission Bay | Direct, New | 45,308 | NNN Starting | 58.20 | Signed Mar 2, 2021; 3% escal.; ARE landlord. |
| 2021 | 1800 Owens St (Vir) | Mission Bay | Direct, Renewal | 133,895 | NNN Effective | 83.28 | Signed Nov 1, 2021; start $76.20; 7 mos free; 12-yr term. |
| 2021 | 6000 Shoreline Ct (Nkarta) | South SF | Direct, Renewal | 8,075 | NNN Starting | 75.00 | Signed Oct 19, 2021; term to 2029. |
| 2021 | Modular Labs I, 333–351 Allerton | South SF | Direct, Renewal | 21,927 | NNN Effective | 72.36 | Signed Oct 14, 2021; 5-yr; TI/free rent noted. |
| 2021 | 1150 Veterans Blvd (Nkarta) | South SF | Direct, New | 88,106 | NNN Effective | 91.20 | Signed Jul 9, 2021; start $76.80; TI $175/SF; 12-yr term. |
| 2021 | 200 Pine St (Jaguar Health) | SF CBD | Direct, Renewal | 10,526 | NNN Starting | 48.00 | Signed Dec 24, 2021; 3% escal. |
| 2022 | 333 Oyster Point Blvd (NGM) | South SF | Direct, Renewal | 121,760 | NNN Effective | 98.52 | Signed Jul 7, 2022; start $88.80; 10-yr. |
| 2022 | 280 E Grand Ave (Alumis) | South SF | Direct, New | 54,586 | NNN Effective | 93.00 | Signed Aug 11, 2022; start $82.20; 10-yr; 2 mos free. |
| 2022 | 250 E Grand Ave (Septerna) | South SF | Direct, New | 9,348 | NNN Starting | 66.00 | Signed Sep 14, 2022; commenced Oct 2022. |
| 2022 | 250 E Grand Ave (Septerna) | South SF | Direct, Renewal | 22,911 | NNN Effective | 93.60 | Signed Dec 22, 2022; start $87.60; 4 mos free; 8-yr. |
| 2022 | 4000 Shoreline Ct (Kezar) | Brisbane/Daly City | Direct, Renewal | 45,998 | Effective | 84.24 | Signed Nov 1, 2022; start $87.00; 3 yrs 9 mos. |
| 2022 | 1700 Montgomery St (Third Harmonic) | SF Waterfront | Direct, New | 4,703 | Effective | 70.51 | Signed Oct 19, 2022; 3 mos free; 5 yrs 3 mos. |
| 2022 | 500 Sansome St (Omada) | SF CBD | Direct, Renewal | 13,610 | FSNP Starting | 59.00 | Signed Jan 5, 2022; 3-yr term. |
| 2021–2022 | 2000 Sierra Point Pkwy (Tempest) | Brisbane | Direct, New | 20,116 | NNN Starting | 86.40 | Signed Jan 24, 2022; 8-yr; commenced Oct 2022. |
| 2023 | 1150 Veterans Blvd (Nkarta) | South SF | Direct, Renewal | 88,106 | NNN Starting | 83.76 | Signed Jul 1, 2023; TI $225/SF; 10 yrs 5 mos. |
| 2023 | 5000 Shoreline Ct (Ideaya) | South SF | Direct, New | 43,966 | NNN Effective | 78.24 | Signed Jun 1, 2023; start $84.00; 21 mos free; 10-yr; commence Jun 2024. |
| 2023 | 1700 Montgomery St (Third Harmonic) | SF Waterfront | Direct, New | 4,703 | Effective | 70.51 | Signed Oct 19, 2022; remained relevant to 2023 commencement. |
| 2021–2023 | 200 Pine; 500 Sansome | SF CBD | Direct | 10–14k | Starting | $48–$59 FS/NNN | Illustrative CBD bands vs. lab markets. |

101. This substantial subleasing activity and tenant concessions that other companies gave also hurt the San Francisco Megacampus. While Defendants told investors during the Class Period that Alexandria was immune from the prevailing market dynamics of increased supply and lowered demand because tenants would continue to choose the Company's purportedly superior properties over those of other companies, that was simply not the case.

102. For example, CoStar shows that a new development called Nexus on Grand opened in 2022 fully leased with significant long term leases in place, capturing a large market share that included a 32,113 square foot space leased for $68.40 per square foot to Graphite Bio, 63,246 square feet leased to Myriad Genetics through August 2032, and 31,575 square feet leased to TCG Labs in 2023 that was signed well ahead of an upcoming

37

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

vacancy in 2024. Alexandria's San Franscisco Megacampus was required to compete with such fully leased inventory, in addition to the growing pool of sublease space and tenant concessions discussed above. The Company reported that the San Franscisco Megacampus had only 70.8% of its operating and redevelopment space, and 86.6% of its operating space, occupied as of December 31, 2023, with those figures steadily declining to 69.2% and 80.7% as of September 30, 2025, just before Alexandria announced on December 3, 2025 that it was selling the property with a $208 million impairment.

103. In the aggregate, this contemporaneous evidence of elevated subleasing, tenant concessions, and competition from better-performing buildings shows substantial distress to the San Francisco Megacampus that Defendants' public disclosures concealed.

### c. Confidential Witnesses Show That the Impairments Were Present Earlier

#### i. CW 1

104. A former Alexandria employee, from mid-2021 to April 2024, discussed the Long Island City Property in detail (Confidential Witness 1 ("CW 1")). CW 1 worked in Alexandria's New York office, as Head of Alexandria LaunchLabs from January 2023 to April 2024 and prior to that worked on LaunchLabs NYC. The New York team that CW 1 was on was regionally focused and CW 1 was familiar with the Long Island City Property. CW 1 noted that there were occupancy problems at the Long Island City Property during CW 1's tenure at the Company. By the time CW 1 left the Company in April 2024, "it had been a struggle with the occupancy of that building for months before that point."

105. CW 1 knew about these problems from attending regular regional leasing meetings. When asked whether employees discussed specific occupancy figures in meetings, CW 1 stated, "Yeah. Of course. That's their business." In addition, CW 1 explained that the Long Island City Property started from a very low point in terms of occupancy.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS: Case No. 2:25-CV-11319-GW (AGRX)

106.   The concern over occupancy at the Long Island City Property grew throughout 2023 to the point that CW 1 explained it was "all hands on deck." This witness recalled the attitude at the Company toward the Long Island City Property at that point as, "We got to turn this around. This is getting desperate now." CW 1 stated that by the end of 2023 or early 2024, the Company's attitude towards the Long Island City Property was, "Oh, crap. We've tried everything we normally do. It's not working. Now what do we do?" CW 1 also stated that Marcus, the Company's Principal Executive Officer, Chairman, and Founder, made a decision around that time to try to sell the building.

107.   In particular, CW 1 explained that Marcus decided to try to sell the Long Island City Property towards the end of 2023 or at the beginning of 2024. When this witness was asked if they recalled discussions about having to sell the building, CW 1 stated there was "a meeting where that was the conclusion." The witness explained that this meeting occurred in late 2023 or early 2024 because "it was not shortly before I left. There was time before I left" the Company (which was in April 2024). CW 1 also specifically confirmed that it was Marcus' decision in that meeting to sell the property. The witness emphasized that the Company was so micromanaged that major decisions like that would not happen without involvement from the top.

108.   CW 1 also explained the background leading up to Marcus's decision to sell the Long Island City Property. The witness identified 2023 as a shift in the Company's approach to the property. By then, it had become clear that "people aren't going there just because it's an option." The witness stated that the concern kept building as normal leasing efforts failed. Throughout CW 1's time at the Company, the witness attended quarterly "leasing" meetings for the New York region attended by Marcus, where the Long Island City Property was a recurring topic of discussion. CW 1 stated that Marcus knew about the leasing problems at the Long Island City Property and was directly involved. CW 1 specifically described Marcus as someone who "micromanaged the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

company," referred to him as the Company's Founder and Chairman, and stated that "a coffee doesn't get ordered without him knowing." The witness also stated that "leadership is very hands on at ARE [Alexandria], so that kind of discussion doesn't get had without it going all the way, kind of all the way through leadership." CW 1 explained that the Company's Executive Vice President and Regional Director of New York was the person most directly in charge of the Long Island City Property, but major decisions did not stop with that person.[20] Rather, CW 1 explained, the Company was really micromanaged by Marcus, the Chairman.

109. In addition, CW 1 explained that the key meetings where these issues with the Long Island City Property were discussed were in-person, region-specific quarterly leasing meetings, which Marcus attended. The Executive Vice President and Regional Director of New York would lead these meetings, which included charts and presentations describing what Alexandria was trying to do at the Long Island City Property, including what was working, what was not working, and the leasing figures for the building. These presentations included the specific square footage of space leased. CW 1 stated that Marcus would have known the status of the Long Island City Property through these meetings and the specific information presented at them, including charts, leasing figures, and talking points.

110. CW 1 also described the occupancy problems at the Long Island City Property in more detail. By the start of 2023, it was clear that the building was struggling to attract tenants. Alexandria tried many approaches to improve leasing and attract more tenants at the property, which CW 1 described as "everything. Everything you can imagine." This included offering better deals to tenants and putting more effort into tenant

---

[20] CW 1 stated that John Cunningham was the Executive Vice President and Regional Director of New York until he left the Company in 2023. The Company's website lists Joshua Mitchell as its current Executive Vice President and Regional Market Director for New York, as part of the Company's Executive Management.

40

outreach. CW 1 stated, "I feel like it was building through '23 to, like, 'Oh crap, we've tried everything we normally do. It's not working. Now what do we do?'" These tenancy issues were a regular topic in the regional meetings that CW 1 described. The witness stated that there were repeated discussions that the Long Island City Property was not doing well.

111.    This witness described the specific problems with the Long Island City Property in detail. CW 1 explained that while Alexandria kept trying normal leasing tools, by 2023, those methods were not solving the problem. The witness stated that in "2023 it was all hands on deck. It was like, 'We got to turn this around. This is getting desperate now.'" CW 1 also explained that the Company had renovated the Long Island City Property in 2022 to make it attractive for life science tenants. But even with the improved, renovated space and favorable pricing, the property remained difficult to lease because of the location. The witness explained that the main problem with the Long Island City Property was the location. CW 1 said, "Nobody wanted to be there" and described it as "a pretty rundown part of Long Island City." CW 1 stated that the space itself was strong because the Company had renovated it for life science tenants, but the surrounding area made it a hard sell, as it is largely industrial and warehouse space. It was therefore "hard to get people to want that location."

112.    CW 1 explained that there was a broader biotech downturn that started in 2023, but that the tenancy issues at the Long Island City Property were treated differently from the broader biotech downturn. The witness described the Long Island City Property as a different problem, separate from the macro environment. CW 1 explained that the Company even offered lower rents for the Long Island City Property than its main campus in Manhattan nearby, but the problem with the Long Island City Property was that no one wanted to move in.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

### ii.  CW 2

113.    Another former Alexandria employee, a Director of Real Estate Development, from March 2021 through February 2025 (CW 2") reported to Defendant Kass, who in turn reported to Defendant Marcus. CW 2 worked in the Company's offices in Massachusetts, primarily covering new construction projects in the Boston area. CW 2's responsibilities included handling contract processing, coordinating with vendors and internal accounting teams, and supporting project managers on construction and development projects. This witness stated that everyone in the Boston region reported to Defendant Kass. CW 2 stated that at the beginning of the witness's time at the Company, the need for bioscience lab space was quite high and the Company typically already had a tenant in place when it was building a new development.

114.    But CW 2 explained that in their last year with the Company (i.e., since early 2024), the witness observed a change whereby pharmaceutical companies were coming under scrutiny by investors who started pulling back investments. As a result, Alexandria was facing difficulty in getting space leased and finding interested tenants. The Company not only was not buying as much land, but it started disposing of it. During that time, CW 2 overheard Kass speak with the Senior Vice President of Greater Boston and Head of Leasing (Adam Brinch) in the office about issues occupying buildings. These discussions occurred in informal conversations between Kass and Brinch, rather than in official meetings.

### F.    Alexandria Was Required to Disclose Its Impairments Under GAAP

115.    In addition to misrepresenting nature of Alexandria's business related to the Impaired Properties, such as the Company's disposition strategy, dividend, and related financial results, Defendants misrepresented the status the Company's impairments under Generally Accepted Accounting Principles ("GAAP").

116.    This Section on GAAP standards and the Company's application of them is based on consultation with Arcady Zaydenverg, a forensic accounting expert retained by

42

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

Lead Plaintiff. Mr. Zaydenverg is a Certified Public Accountant ("CPA") licensed in New York and a Certified Fraud Examiner ("CFE") with almost thirty years of experience in public and private accounting. He has worked as an external and internal accountant with a broad array of companies in various industries. He specializes in providing forensic accounting and litigation advisory services, which often includes, among other things, analyzing financial statements, performing financial modeling, analyzing the application of accounting and auditing standards, fraud investigations, and calculating commercial damages.

### a.  GAAP Standards for the Impairment of Real Estate

117.    GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements.

118.    The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading and inaccurate despite footnote or other disclosures, unless the Commission has otherwise provided.

119.    ASC 360, *Property, Plant, and Equipment*, is the authoritative accounting standard that governs the accounting for long-lived assets,[21] including evaluation of these

---

[21] Long-lived assets may include property, plant, and equipment (e.g., land and improvements, buildings, furniture and fixtures), finite-lived intangible assets, and right-of-use assets.

43

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

assets for impairment. Real estate falls under the category of long-lived assets. Impairment is the condition that exists when the carrying amount of a long-lived asset exceeds its fair value. ASC 360-10-20.

120.   Long-lived assets are subject to two accounting models for assessing their carrying amounts: (1) assets to be held and used and (2) assets to be disposed of by sale (i.e., held for sale).

121.   Long Lived Assets Held and Used: Long-lived assets classified as held and used should be tested for impairment whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable.[22] ASC 360-10-35-21. GAAP provides the following examples of such events or changes in circumstances:

- A significant decrease in the market price of a long-lived asset.

- A significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition.

- A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset, including an adverse action or assessment by a regulator.

- An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset.

- A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset.

- A current expectation that, more likely than not, a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously

---

[22] The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. That assessment shall be based on the carrying amount of the asset at the date it is tested for recoverability, whether in use or under development. ASC 360-10-35-17.

44

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

estimated useful life. The term more likely than not refers to a level of likelihood that is more than 50 percent.

ASC 360-10-35-21.

122. The above list is not meant to be all-inclusive, and there might be other situations, including circumstances that are specific to an entity's business or industry, that indicate an impairment might exist or that the carrying amount of a long-lived asset might not be recoverable.

123. The first step in the impairment test is to determine whether the long-lived assets are recoverable, which is determined by comparing the net carrying value of the asset to the entity-specific, undiscounted net cash flows to be generated from the use and eventual disposition of that asset. ASC 360-10-35-17. This is commonly referred to as the recoverability test.

124. GAAP provides the following guidance with respect to estimating future cash flows used to test long-lived assets for recoverability:

Estimates of future cash flows used to test the recoverability of a long-lived asset ([or] asset group) shall include only the future cash flows (cash inflows less associated cash outflows) that are directly associated with and that are expected to arise as a direct result of the use and eventual disposition of the asset ([or] asset group). Those estimates shall exclude interest charges that will be recognized as an expense when incurred. ASC 360-10-35-29.

Estimates of future cash flows used to test the recoverability of a long-lived asset ([or] asset group) shall incorporate the entity's own assumptions about its use of the asset ([or] asset group) and shall consider all available evidence. *The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others. However, if alternative courses of action to recover the carrying amount of a long-lived asset ([or] asset group) are under consideration or if a range is*

45

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

*estimated for the amount of possible future cash flows associated with the likely course of action, the likelihood of those possible outcomes shall be considered.* A probability-weighted approach may be useful in considering the likelihood of those possible outcomes. ASC 360-10-35-30.

Estimates of future cash flows used to test the recoverability of a long-lived asset ([or] asset group) shall be made for the remaining useful life of the asset ([or] asset group) to the entity. ASC 360-10-35-31.

Estimates of future cash flows used to test the recoverability of a long-lived asset ([or] asset group) that is in use, including a long-lived asset ([or] asset group) for which development is substantially complete, shall be based on the existing service potential of the asset ([or] asset group) at the date it is tested. The service potential of a long-lived asset ([or] asset group) encompasses its remaining useful life, cash-flow-generating capacity, and for tangible assets, physical output capacity. Those estimates shall include cash flows associated with future expenditures necessary to maintain the existing service potential of a long-lived asset ([or] asset group), including those that replace the service potential of component parts of a long-lived asset (for example, the roof of a building) and component assets other than the primary asset of an asset group. Those estimates shall exclude cash flows associated with future capital expenditures that would increase the service potential of a long-lived asset ([or] asset group). ASC 360-10-35-33.

Estimates of future cash flows used to test the recoverability of a long-lived asset ([or] asset group) that is under development shall be based on the expected service potential of the asset (group) when development is substantially complete. Those estimates shall include cash flows associated with all future expenditures necessary to develop a long-lived asset ([or] asset group), including interest payments that will be capitalized as part of the cost of the asset ([or] asset group). ASC 360-10-35-34.

46

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

125.   Under this standard, if the assets *are* recoverable (i.e., the undiscounted net cash flows exceed the net carrying value of the asset), an impairment should not be recognized, even when the net carrying value of the long-lived assets exceeds their fair value. If the assets are *not* recoverable (i.e., the net carrying value of the asset exceeds the undiscounted net cash flows), an impairment loss should be recognized based on the amount by which the carrying value of the asset exceeds its fair value. ASC 360-10-35-17.

126.   Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. ASC 820-10-20 and ASC 820-10-35-3. Fair value represents an exit price, not an entry price. ASC 820-10-35-9A. The fair value of the long-lived assets should be determined from the perspective of a market participant considering, among other things, appropriate discount rates, valuation techniques, the most advantageous market, and assumptions about the highest and best use of the long-lived assets. ASC 360-10-35-36, ASC 820-10-35-9 – 10E and ASC 820-10-35-24A. The exit price objective of a fair value measurement applies regardless of the reporting entity's intent or ability to sell the asset or transfer the liability at the measurement date. Fair value is intended to represent an exit price in the current market, not the potential value of the asset or liability at some future date. (EY Impairment or Disposal of Long-Lived Assets, August 2025, Section 2.4.1.)

127.   The following disclosures are required for impairments of long-lived assets classified as held and used in the period the impairment loss is recognized:

- A description of the impaired long-lived asset ([or] asset group) and the facts and circumstances leading to the impairment.

- If not separately presented on the face of the statement, the amount of the impairment loss and the caption in the income statement or the statement of activities that includes that loss.

47

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

- The method or methods for determining fair value (whether based on a quoted market price, prices for similar assets, or another valuation technique)

- If applicable, the business segment in which the impaired long-lived asset ([or] asset group) is reported.

ASC 360-10-50-2.

128. Long Lived Assets Held for Sale (including real estate): In contrast to long-lived assets that are classified as held and used, such assets should be classified as held for sale when they meet the following requirements:

- Management, having the authority to approve the action, commits to a plan to sell the asset.

- The asset is available for immediate sale in its present condition subject only to terms that are usual and customary for sales of such assets.

- An active program to locate a buyer and other actions required to complete the plan to sell the asset have been initiated.

- The sale of the asset is probable, and transfer of the asset is expected to qualify for recognition as a completed sale, within one year … . The term probable refers to a future sale that is likely to occur.

- The asset is being actively marketed for sale at a price that is reasonable in relation to its current fair value. The price at which a long-lived asset is being marketed is indicative of whether the entity currently has the intent and ability to sell the asset. A market price that is reasonable in relation to fair value indicates that the asset is available for immediate sale, whereas a market price in excess of fair value indicates that the asset is not available for immediate sale.

- Actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn.

48

ASC 360-10-45-9.[23]

129.   Beginning in the period the aforementioned *held for sale* criteria are met, a long-lived asset should be classified as *held for sale* and reported at the lower of its carrying value or fair value less cost to sell. ASC 360-10-45-9 and ASC 360-10-35-43.

130.   A long-lived asset classified as held for sale should be presented separately on the balance sheet of the current period. ASC 360-10-45-14.  The carrying amount of the asset should be adjusted each reporting period for subsequent changes in fair value less cost to sell. A loss should be recognized for any subsequent write-down to fair value less cost to sell. A gain should be recognized for any subsequent increase in fair value less cost to sell, but not in excess of the cumulative loss previously recognized. ASC 360-10-35-40.

### b.  The Company Represented That it Complied With GAAP

131.   During the Class Period, Alexandria disclosed its standard for taking impairments on its real estate as part of its "critical accounting estimates" in "accordance with GAAP" (i.e., Generally Accepted Accounting Principles in the United States).

132.   Alexandria described its real estate impairment policy under its "Summary of significant accounting policies," which differentiated between "long-lived assets to be held and used" and "properties classified as held for sale."

133.   In particular, the Company explained in its 2024 Annual Report, as to the "Impairment of long-lived assets":

> Prior to and subsequent to the end of each quarter, we review current activities and changes in the business conditions of all of our long-lived assets to determine the existence of any triggering events or impairment indicators requiring an impairment analysis. If triggering events or impairment indicators are identified, we review an estimate of the future undiscounted

---

[23] This quotation removes references to "disposal groups," which refers to multiple assets that are sold together. ASC 360-10-20.

49

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

cash flows, including, if necessary, a probability-weighted approach if multiple outcomes are under consideration.

Long-lived assets to be held and used, including our rental properties, CIP, land held for development, right-of-use assets related to operating leases in which we are the lessee, and intangibles, are individually evaluated for impairment when conditions exist that may indicate that the carrying amount of a long-lived asset may not be recoverable. The carrying amount of a long-lived asset to be held and used is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. Triggering events or impairment indicators for long-lived assets to be held and used are assessed by project and include significant fluctuations in estimated net operating income, occupancy changes, significant near-term lease expirations, current and historical operating and/or cash flow losses, construction costs, estimated completion dates, rental rates, and other market factors. We assess the expected undiscounted cash flows based upon numerous factors, including, but not limited to, projected rental rates, exit capitalization rates, and construction costs for projects under development, which are based on available market information, current and historical operating results, known trends, current market/economic conditions that may affect the asset, and our assumptions about the use of the asset, including, if necessary, a probability-weighted approach if multiple outcomes are under consideration.

Upon determination that an impairment has occurred, a write-down is recognized to reduce the carrying amount of the asset to its estimated fair value. If an impairment charge is not required to be recognized, the recognition of depreciation or amortization is adjusted prospectively, as necessary, to reduce the carrying amount of the asset to its estimated disposition value over the remaining period that the asset is expected to be held and used. We may adjust depreciation of properties that are expected to be disposed of or redeveloped prior to the end of their useful lives.

134. The Company continued, as to "properties classified as held for sale":

We use the held for sale impairment model for our properties classified as held for sale, which is different from the held and used impairment model. Under the held for sale impairment model, an impairment charge is recognized if the carrying amount of the long-lived asset classified as held for sale exceeds its fair value less cost to sell. Because of these two different models,

50

it is possible for a long-lived asset previously classified as held and used to require the recognition of an impairment charge upon classification as held for sale.

### c. The Company Violated GAAP Standards for the Impairment of Real Estate

135. Defendants violated GAAP by failing to (1) take impairments upon the Company's quarterly review of its "held and used" assets and (2) failing to reclassify its assets as "held for sale," and take the accompanying impairments, when the Company decided to sell them. Each of these were an independent violation of GAAP standards for the impairment of real estate assets.

136. Alexandria admitted that it reviewed its real estate holdings on a quarterly basis, "[p]rior to and subsequent to the end of each quarter," in order "to determine the existence of any triggering events or impairment indicators requiring an impairment analysis." *Supra* ¶ 133. Such a review, based on the factors mandated by GAAP and those the Company admitted that it considered, show that by the start of the Class Period, and long before the Company first began to announce the impairments on October 27, 2025, the Impaired Properties experienced "triggering events or impairment indicators requiring an impairment analysis," which would have showed that they were already impaired.

137. These triggering events or impairment indicators as to the Impaired Properties are described above and include low occupancy rates, sales of other impaired properties that were closely connected to the Impaired Properties, the decline in rental value of the Impaired Properties, and market-wide factors that the Company fully admitted to when it disclosed the Impaired Properties. *See supra* Section IV.E.

138. Moreover, the fact that the Company ended up selling Megacampus properties with significant impairments, contrary to the Company's prior description of its disposition strategy as focusing specifically on non-Megacampus properties, shows a drastic change in the Company's strategy, constituting a triggering event or impairment indicator.

51

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

139.    The Company itself states that "[t]riggering events or impairment indicators for long-lived assets to be held and used are assessed by project and include significant fluctuations in estimated net operating income, occupancy changes, significant near-term lease expirations, current and historical operating and/or cash flow losses, construction costs, estimated completion dates, rental rates, and other market factors." *Supra* ¶ 133. Alexandria therefore admits that negative changes in these factors on a quarterly basis may constitute triggering events that require an impairment analysis.

140.    These same factors that required the Company to conduct an impairment analysis of the Impaired Properties by the start of the Class Period also showed that they were not recoverable and were substantially impaired by that point in time, and certainly long before the Company finally began to disclose the impairments on October 27, 2025.

141.    In particular, these factors showed that the Impaired Properties were not recoverable under the GAAP recoverability test provided for in ASC 360 when comparing the net carrying value of the assets to the undiscounted net cash flows expected to be generated from the use and eventual disposition of the assets. The low occupancy rates, impaired sales of closely related properties, decline in rental values, market-wide downturn in both supply and demand, and drastic change in the Company's disposition strategy show that the Company could not maintain its prior expectation of expected cash flows for these properties, to justify keeping their carrying values unchanged.

142.    This conclusion is especially strong because GAAP requires that estimates of future cash flows in the recoverability analysis "shall consider all available evidence" and the "assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods." *Supra* ¶ 124. As the Company itself admits, "[w]e assess the expected undiscounted cash flows based upon numerous factors, including, but not limited to, projected rental rates, exit capitalization rates, and construction costs for projects under

52

development, which are based on available market information, current and historical operating results, known trends, current market/economic conditions that may affect the asset." *Supra* ¶ 133.

143. Furthermore, even when a property is categorized as held for use, both GAAP and the Company's own description of its accounting policy require the potential sale of a property to be considered in the recoverability analysis. Under ASC 360's description of the recoverability analysis, "if alternative courses of action to recover the carrying amount of a long-lived asset ([or] asset group) are under consideration . . . , the likelihood of those possible outcomes shall be considered. A probability-weighted approach may be useful in considering the likelihood of those possible outcomes." *Supra* ¶ 124. Similarly, the Company states as to its recoverability analysis that "[w]e assess the expected undiscounted cash flows based upon numerous factors, including, . . . if necessary, a probability-weighted approach if multiple outcomes are under consideration." *Supra* ¶ 133.

144. This means that if the Company was considering the sale of any of the Impaired Properties, it was required to account for the expected sale price on a probability-weighted basis in its assessment of expected cash flows in the recoverability analysis. For example, if (as an alternative to holding a property) there was a 50 percent chance that the Company would sell a property and, due to the decline in the fair value of the property, the cash flows from the expected sale (which the Company would receive in the form of the sale price) were 50 percent below the cash flows from holding the asset, that by itself would result in a 25 percent reduction to the future undiscounted cash flows in the recoverability analysis.[24] Therefore, a severe decline in the fair value of a property could lead to both (1) a failure to meet the recoverability criteria and (2) recognition of

---

[24] This calculation is a straightforward application of the probability-weighted approach: 50% chance of sale x 50% percent decrease in cash flows = 25% decline in the undiscounted future expected cash flows on a probability-weighted basis.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

an impairment when it is compared to the carrying value of the asset in the next step of the impairment analysis.

145.   The likelihood of the Company selling the Impaired Properties, and the expected difference between their sale prices and carrying values, were actually much higher based on the information described above. For example, CW 1 explained that by early 2024, Defendant Marcus already planned to sell the Long Island City Property.

146.   Moreover, the expected sale price of that property was already significantly depressed by that time based on consistently low occupancy rates for the entire time the Company leased out the building, the clear undesirability of its location as described by CW 1 and recognized by the Company by it separating its disclosures for the building from the remainder of the New York City market, and the Company's sale at a steep loss of another building in December 2023 that was part of the same Long Island City project.

147.   The Company did not disclose its sale of its other Long Island City property in December 2023 on an individual basis and appears instead to have included it in its aggregate figures, but its sale for over 23% less than the purchase price points to even more pronounced impairment indicators relevant to the Long Island City Property. The Company disclosed in its 2023 Annual Report (filed with the SEC on January 29, 2024) that the main Long Island City Property, which it continued to hold, was purchased for approximately $23 million, but had a net cost basis of approximately $227 million, after accounting for $53 million in initial building and improvement costs, $159 million in costs capitalized subsequent to the acquisition, and a $7 million depreciation reduction. By the Company's 2024 Annual Report, the net cost basis for the Long Island City Property rose to $229 million.[25] The 23% loss that the Company suffered on its other Long Island City property in December 2023 as compared to its purchase price thus

---

[25] The Company did not regularly disclose carrying values on a property-specific basis, but the net cost basis tracks closely with the carrying value of the Impaired Properties because the Company did not previously disclose any significant impairments for them.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

reflects just a small portion of the impairment loss of the Long Island City Property that existed at that time. The Company then recognized a $206.2 million impairment of the Long Island City Property on October 27, 2025 when it finally reduced its carrying amount to its fair value, and proceeded to sell the property in December 2025 for $34.5 million (as disclosed in the Company's 2025 Annual Report).

148. Given the property-specific and market-wide factors described above, as well as the Company's drastic divergence from its stated disposition plan, it is also implausible that it did not consider selling the other Impaired Properties before the fourth quarter of 2025. The likelihood of those sales, and the decrease in the expected sale price as compared to the carrying value of these properties, should therefore have been taken into account in the Company's probability-weighted recoverability analysis from the beginning of the Class Period.

149. The Company's subsequent disclosures show even further that it planned to sell the Impaired Properties much earlier than it disclosed. Indeed, the Company disclosed in its 2025 Annual Report (filed with the SEC on January 26, 2026) that *the sales of at least the following Impaired Properties were already completed in December 2025*, with the remainder expected to be completed in 2026:

- The Long Island City Property that had a $206.2 million impairment was sold on December 19, 2025 for $34.5 million;

- The San Francisco Megacampus (601, 611, 651, 681, 685, 701, and 751 Gateway Boulevard) that had a $208 million impairment was sold on December 30, 2025 for $283.2 million;

- The Seaport Innovation District properties that had a $150 million impairment were sold on December 30, 2025 for $33.5 million;

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

- At least a portion of the Research Triangle properties that collectively had a $82.5 million impairment charge, including one at 3029 East Cornwallis Road that was sold on December 31, 2025 for $29.5 million.[26]

150.    These are just some of the Impaired Properties that the Company had already completed selling by the end of 2025 because it did not disclose every sale individually or state how they corresponded to the Impaired Properties. In addition, the Company explained in its 2025 Annual Report that $910.7 million of the $2.2 billion in impairments that it recognized in 2025 corresponded to properties that, as of December 31, 2025, it had "committed to dispose in 2026." Analysts such as Evercore (in its December 4, 2025 note titled "Investor Day Recap - Sluggish Demand & Disposition Program Pull Down Estimates") understood that the majority of the Company's dispositions in 2026 would occur in the first half of the year.

151.    The sheer scale of the Company's impairments that it took upon categorizing the Impaired Properties as "held for sale" also show that these sales could not have all been planned at the last minute:

| | Aggregate Sales Price of Dispositions and Sales of Partial Interests | Impairment of Real Estate | Capitalization Rates[1] | Capitalization Rates (Cash Basis)[1] |
|---|---|---|---|---|
| 2023 | $ 1,314,414 | $ 461,114 | 6.7% | 5.9% |
| 2024 | $ 1,382,453 | $ 223,068 | 7.7% | 6.5% |
| 2025 | $ 1,813,778 | $ 2,202,818 | 7.7% [2] | 7.5% [2] |
| Midpoint of 2026 guidance range | $ 2,900,000 | [3] | | |

152.    The progression of the Company's impairments announced in 2025 also shows that the Company knew before October 27, 2025 that it planned sell the Impaired Properties much earlier. Through the first two quarters of 2025, the Company announced impairments that were in line with prior years and then announced a vast increase, reflecting a notable break from the past, starting with its results for the third quarter:

---

[26] This $71.5 million impairment charge that the Company disclosed on December 3, 2025 for the Research Triangle properties increased to $82.5 million in the Company's 2025 10-K that it issued on January 26, 2026.

56

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

- **Q1 2025:** $32.2 million.

- **Q2 2025:** $129.6 million.

- **Q3 2025 (October 27, 2025):** $323.9 million; anticipated additional impairment charges of up to $685 million.

- **Investor Day (December 3, 2025) guidance update**: Q4 impairment of $1.3 billion, including the previously announced $685 million.

- **Full Year 2025 (January 29, 2026):** approximately $2.2 billion for the entire year.

153. It is implausible that the Company had only $162 million in impairments through the first half of 2025 and then *over $2 billion more—over ten times the impairments in the first half of the year*—in the second half of the year, with the vast majority of that $2 billion coming in the last three months of the year. Defendants plainly waited until the last minute to recognize these impairments. This violated GAAP because the Company was required to account for the drastically lower potential for these properties when it analyzed them on a quarterly basis even when they were held for use.

154. Even assuming there was some chance the Company would keep the Impaired Properties and that their net cash flows were expected to be consistent with their carrying values, they would fail the recoverability analysis purely based on the significant likelihood that the Company would sell them and the reduced price they would receive in such a sale. Those are also very conservative assumptions in favor of the Company because Alexandria already suffered significant setbacks in being able to rent out the Impaired Properties at previous rental rates and the most plausible inference is that the Company already decided to sell them.

155. This analysis shows that the Impaired Properties were not recoverable from the start of the Class Period. The Company was therefore required to take the next step and conduct a fair value analysis to determine the amount of the impairments of the

57

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS: Case No. 2:25-CV-11319-GW (AGRX)

Impaired Properties. Any such analysis would have shown significant impairments in terms of the difference between their carrying values and fair values less cost to sell, based on the expected sale prices and other factors described above. Alexandria, however, never even got to that point because it improperly maintained that the Impaired Properties were not impaired at all until the end of the Class Period, when it categorized them as "held for sale." The Company, however, failed to recognize that the Impaired Properties were impaired even under the analysis that applies to properties that are "held and used."

156. The Company also made a ***further error*** by failing to categorize the Impaired Properties as held for sale until the very last minute. The analysis above shows that the Company had a definitive plan to sell the Impaired Properties significantly before it disclosed those sales on October 27, 2025 and December 3, 2025. The Company was therefore required to categorize these properties as "held for sale," and take the impairment based on the difference between their carrying values and fair values that were far lower due to the expected sale prices, when the held for sale criteria were met.

**G.     The Individual Defendants Profited from their Fraud**

157. Defendants Marcus, Moglia and Kass were motivated by substantial financial benefits to engage in the fraud here.

158. Defendants Marcus, Moglia and Kass engaged in suspicious sales of Alexandria's stock before the Company announced substantial impairments and the reduction of its income per share and FFO guidance.

159. On February 26, 2024, Defendant Marcus sold 7,500 shares for an average of $118.92 per share, for proceeds of $898,650.

160. On March 1, 2024, Defendant Moglia sold 3,200 shares for an average of $122.90 per share for proceeds of $393,280.

161. On December 9, 2024, Defendant Kass sold 5,000 shares for an average of $106.13 per share, for proceeds of $530,650.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

162.   On December 16, 2024, Defendant Moglia sold 10,000 shares for $102.26 per share, for proceeds of $1,022,600.

163.   Defendants Marcus, Moglia and Kass' open market stock sales during the Class Period that netted them over $2.84 million are highly suspicious for multiple reasons. In particular, while these Defendants made these profits from their insider sales, they did not make *any* open-market purchases during the Class Period. These stock sales were also suspiciously timed, especially because Defendants Marcus, Moglia and Kass sold all of these shares at artificially inflated prices, for substantially more than the $45.48 per share that the Company's share price fell to following the final corrective disclosure on December 3, 2025, netting them substantially more profit than they would have received if Alexandria's stock was not inflated by their false and misleading statements.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

164.   Throughout the Class Period, Defendants made materially false and misleading statements regarding the business and operations of Alexandria. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (a) the Impaired Properties had already suffered substantial impairments; (b) because of the impairments, the Company was not able to self-fund through sales of its properties; (c) macroeconomic factors were hurting the Company by causing impairments to the Impaired Properties; (d) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy; and (e) the Company was unable to maintain the strength of its dividend because of the impairments to the Impaired Properties.

165.   The Class Period begins on January 30, 2024, when Alexandria held an earnings call with analysts and investors in conjunction with its 4Q2023 and FY23 financial results, on which Defendants Marcus, Moglia, Binda, and Kuhn all spoke. In response to an analyst's question regarding the impact impairments would have on

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

investment gains, Defendant Binda said, "We did have some impairments during the quarter here, Jamie. But I think when we look back over three years, we've averaged like $96 million [in investment gains] over the last three years per year. And so over a longer period, when we look back, *the impairments have been pretty modest* relative to the size of those gains."

166. The foregoing statements in ¶ 165 were materially false and misleading because (1) the Impaired Properties had already suffered substantial impairments and (2) because of the impairments, the Company was not able to self-fund through sales of its properties.

167. As part of his opening remarks on this January 30, 2024 call, Defendant Marcus said, "We have given and reconfirmed very solid detailed guidance for 2024, and we believe that the life science industry will continue to benefit most importantly, from some key macro tailwinds in 2024."

168. While discussing leasing and supply as part of his opening remarks, Defendant Moglia said, "We've returned to the fundamentals which were trending positively before 2021 and 2022. So we feel really good about the near- and long-term prospects for our business." Turning to the Company's value harvesting and asset recycling program he added, "Continued demand for our assets enabled us to self-fund our investments as we presented at Investor Day."

169. The foregoing statements in ¶¶ 167-68 were materially false and misleading because (1) the Impaired Properties had already suffered substantial impairments, (2) because of the impairments, the Company was not able to self-fund through sales of its properties, and (3) macroeconomic factors were hurting the Company by causing impairments to the Impaired Properties.

170. On April 22, 2024, Alexandria filed with the SEC a Form 8-K, signed by Defendants Marcus, Moglia and Binda that attached a press release issued the same day

60

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

announcing the Company's 1Q2024 financial results and included supplemental information along with the Company's 1Q2024 presentation slides (collectively, the "1Q2024 Earnings Release").

171. While discussing Alexandria's "Adjusted EBITDA and Adjusted EBITDA margin," the 1Q2024 Earnings Release represented the following regarding the impairment of real estate:

| | Three Months Ended | | | | |
| (Dollars in thousands) | 3/31/24 | 12/31/23 | 9/30/23 | 6/30/23 | 3/31/23 |
|---|---|---|---|---|---|
| Net income (loss) | $ 219,176 | $ (42,658) | $ 68,254 | $ 133,705 | $ 121,693 |
| Interest expense | 40,840 | 31,967 | 11,411 | 17,072 | 13,754 |
| Income taxes | 1,764 | 1,322 | 1,183 | 2,251 | 1,131 |
| Depreciation and amortization | 287,554 | 285,246 | 269,370 | 273,555 | 265,302 |
| Stock compensation expense | 17,125 | 34,592 | 16,288 | 15,492 | 16,486 |
| Gain on sales of real estate | (392) | (62,227) | — | (214,810) | — |
| Unrealized (gains) losses on non-real estate investments | (29,158) | (19,479) | 77,202 | 77,897 | 65,855 |
| Impairment of real estate | — | 271,890 | 20,649 | 168,575 | — |

172. The foregoing statements in ¶ 171 were materially false and misleading because the "Impairment of real estate" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

173. The 1Q2024 Earnings Release also described Alexandria's "Consistent dividend strategy with a focus on retaining significant net cash flows from operating activities after dividends for reinvestment."

174. The foregoing statements in ¶ 173 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of the impairments to the Impaired Properties.

175. Also on April 22, 2024, Alexandria filed its Form 10-Q with the SEC for the quarter ended March 31, 2024 ("1Q2024 10-Q"). Defendants Marcus, Moglia and Binda signed the 1Q2024 10-Q and signed the accompanying certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein. As part of the SOX certifications, Defendants Marcus, Moglia and Binda attested that "the financial

61

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report." These Defendants also attested in their SOX certifications that they "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

176. The 1Q2024 10-Q described the Company's "Consistent dividend strategy with a focus on retaining significant net cash flows from operating activities after dividends for reinvestment."

177. The foregoing statements in ¶ 176 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of the impairments to the Impaired Properties.

178. On April 23, 2024, Alexandria held an earnings call with analysts and investors in conjunction with its 1Q2024 financial results, on which Defendants Marcus, Moglia, Binda and Kuhn all spoke. As part of his opening remarks, Defendant Binda said, "we expect to recycle capital into our highly leased development and redevelopment pipeline through outright dispositions and partial interest sales primarily focused on assets not integral to our mega campus strategy."

179. In response to an analyst question regarding how new supply is competing with the expiring leases in Alexandria's operating portfolio, Defendant Moglia said, "I don't think it's competing very well at all. And that's illustrated by our occupancy and the cash and GAAP rent spreads that we reported today. I mean, we've been saying for a long time that our brand and platform of mega campuses means a lot to our tenants and I think it's just proving out." He added, "if Alexandria has space available that fits what the

62

tenants' needs are, 90%+ of time, they're going to come to us because we know what we're doing. We can scale them. We have operational excellence, and I say this all the time, no one's going to get fired, for picking an Alexandria building. You might get fired for picking a building from someone who has no idea what they're doing."

180. Then, in response to an analyst question regarding funding and Alexandria's preference for dispositions rather than stake sales, Defendant Marcus said, "our focus is on our sources of capital to fund our business on the noncore assets outside of the mega campus."

181. The foregoing statements in ¶¶ 178-80 were materially false and misleading because (1) macroeconomic factors were hurting the Company by causing impairments to the Impaired Properties, (2) the Company was not able to self-fund through sales of its properties as a result of the impairments, and (3) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy rather than limiting dispositions to properties that were "noncore assets outside of the mega campus." Moreover, contrary to the suggestion that new supply was not detracting from the Company's leasing of its Megacampuses, the additional supply in the market was hurting the Company's Megacampuses.

182. On July 22, 2024, Alexandria filed with the SEC a Form 8-K, signed by Defendants Marcus, Moglia and Binda that attached a press release issued the same day announcing the Company's 2Q2024 financial results and included supplemental information along with the Company's 2Q2024 presentation slides (collectively, the "2Q2024 Earnings Release").

63

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

183.    While discussing Alexandria's "Other key highlights," "Key items included in net income attributable to Alexandria's common stockholders," the 2Q2024 Earnings Release represented the following regarding the impairment of real estate:

| (in millions, except per share amounts) | 2Q24 | 2Q23 | 2Q24 | 2Q23 | 1H24 | 1H23 | 1H24 | 1H23 |
|---|---|---|---|---|---|---|---|---|
| | Amount | | Per Share – Diluted | | Amount | | Per Share – Diluted | |
| Unrealized losses on non-real estate investments | $ (64.2) | $ (77.9) | $ (0.37) | $ (0.46) | $ (35.1) | $(143.8) | $ (0.20) | $ (0.84) |
| Gain on sales of real estate | — | 214.8 | — | 1.26 | 0.4 | 214.8 | — | 1.26 |
| Impairment of non-real estate investments | (12.8) | (23.0) | (0.08) | (0.13) | (27.5) | (23.0) | (0.16) | (0.13) |
| Impairment of real estate | (30.8) | (168.6) | (0.18) | (0.99) | (30.8) | (168.6) | (0.18) | (0.99) |

184.    The foregoing statements in ¶ 183 were materially false and misleading because the "Impairment of real estate" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

185.    The 2Q2024 Earnings Release also described Alexandria's "Consistent dividend strategy with a focus on retaining significant net cash flows from operating activities after dividends for reinvestment."

186.    The foregoing statements in ¶ 185 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

187.    The 2Q2024 Earnings Release included a presentation slide titled "***Alexandria's Strong Execution of our Asset Recycling Program***" that stated, "Strategic Dispositions and Sales of Partial Interests since 2019" included "$8.4 Billion in Sales" and "$3.0 Billion in Gains."

188.    The foregoing statements in ¶ 187 were materially false and misleading because (1) the Impaired Properties had already suffered substantial impairments, (2) because of the impairments, the Company was not able to self-fund through sales of its properties, and (3) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

64

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

189. Also on July 22, 2024, Alexandria filed its Form 10-Q with the SEC for the quarter ended June 30, 2024 ("2Q2024 10-Q"). Defendants Marcus, Moglia and Binda signed the 2Q2024 10-Q and signed the certifications pursuant to SOX, as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein. The SOX certifications include the same language as referred to in ¶ 175.

190. The 2Q2024 10-Q stated, "During the three months ended June 30, 2023, we recognized real estate impairment charges aggregating $168.6 million" and "During the six months ended June 30, 2023, we recognized real estate impairment charges aggregating $168.6 million."

191. The 2Q2024 10-Q includes charts reporting the same figures for impairment of real estate as reported in the 2Q2024 Earnings Release.

192. The foregoing statements in ¶¶ 190-91 were materially false and misleading because the "Impairment of real estate" and "real estate impairment charges" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

193. The 2Q2024 10-Q described the Company's "Consistent dividend strategy with a focus on retaining significant net cash flows from operating activities after dividends for reinvestment."

194. The foregoing statements in ¶ 193 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

195. On July 23, 2024, Alexandria held an earnings call with analysts and investors in conjunction with its 2Q2024 financial results, on which Defendants Marcus, Moglia, Binda and Kuhn all spoke. As part of his opening remarks on the 2Q2024 earnings call, Defendant Moglia said, "Although the search rings of the tenant bases have

65

expanded with the delivery of new supply, the strike rings have tightened as quality tenants leery of inexperienced and undercapitalized developers choose the trusted brand."

196. Additionally, when responding to an analyst question regarding the impact new supply has on the Company's appetite for upgrading facilities "given the downtime and the risk associated with moving landlords," Defendant Marcus said, "Supply isn't really the big issue. Now supply does impact leasing in the sense that when somebody is looking at space, they could cite [to] other locations. But if the locations aren't really … dead center comparable[s] then those comps don't really make a big difference and people aren't going to pick up and leave for as I say … a few bucks cheaper rent, it just doesn't happen in this industry."

197. The foregoing statements in ¶¶ 195-96 were materially false and misleading because (1) the Impaired Properties had already suffered substantial impairments and (2) macroeconomic factors were hurting the Company by causing impairments to the Impaired Properties, contrary to Moglia's suggestion that "[s]upply isn't really the big issue."

198. During the call, an analyst stated that Alexandria is "funding a lot of your development or most of it with dispositions" and asked if by doing so Alexandria "expose[s] yourself to impairments in this market." Both Defendants Marcus and Moglia responded to the analyst by highlighting the Company's focus on Megacampuses and disposition strategy, while omitting any mention of impairments. Defendant Marcus stated:

> [I]t's pretty clear that in today's fairly, way more disciplined allocation of capital from the life science industry, more and more, it's clear to us, it's been clear for a long time, but even more so today, that the best prospects for leasing and either keeping a tenant or attracting a new tenant is to give them great optionality on a mega campus, great amenities and that's where we want to refocus or double down our efforts and we've gone a long way to bring that to reality. But we think that's where we want to be [at] a period of time where we have fewer and fewer noncore assets, because I think they don't give us

66

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

the optionality to attract or grow with tenants the way we want to grow, not that the buildings aren't leasable because some of them are absolutely great buildings and have great tenants.

199. Defendant Moglia added in response to this same analyst question that the dispositions "would have happened anyway because of our observation that the mega campus model was where we needed to be headed" and "we would have been selling those non-core, non-mega campus assets over time anyway."

200. The foregoing statements in ¶¶ 198-99 were materially false and misleading because (1) the Impaired Properties had already suffered substantial impairments, (2) because of the impairments, the Company was not able to self-fund through sales of its properties, and (3) Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy. These statements were particularly misleading when made in response to an analyst's question regarding exposure to "impairments in the market."

201. Also as part of his opening remarks Defendant Binda said, "Our high-quality cash flows continue to support the growth in our annual common stock dividends with an average annual increase in dividends per share of 5% since 2020."

202. The foregoing statements in ¶ 201 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

203. On October 21, 2024, Alexandria filed with the SEC a Form 8-K, signed by Defendants Marcus, Moglia and Binda that attached a press release issued the same day announcing the Company's 3Q2024 financial results and included supplemental information along with the Company's 3Q2024 presentation slides (collectively, the "3Q2024 Earnings Release").

204. When describing the "***Ongoing successful execution of Alexandria's capital strategy***," the 3Q2024 Earnings Release stated, "We expect to continue pursuing

67

our strategy to fund a significant portion of our capital requirements for the year ending December 31, 2024 with dispositions primarily focused on sales of properties and land parcels not integral to our mega campus strategy."

205. The foregoing statements in ¶ 204 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

206. While discussing Alexandria's "Other key highlights," "Key items included in net income attributable to Alexandria's common stockholders," the 3Q2024 Earnings Release represented the following regarding impairment of real estate:

| (in millions, except per share amounts) | 3Q24 | 3Q23 | 3Q24 | 3Q23 | 3Q24 | 3Q23 | 3Q24 | 3Q23 |
|---|---|---|---|---|---|---|---|---|
| | Amount | | Per Share – Diluted | | Amount | | Per Share – Diluted | |
| Unrealized gains (losses) on non-real estate investments | $ 2.6 | $ (77.2) | $ 0.02 | $ (0.45) | $ (32.5) | $(221.0) | $ (0.19) | $ (1.29) |
| Gain on sales of real estate | 27.1 | — | 0.16 | — | 27.5 | 214.8 | 0.16 | 1.26 |
| Impairment of non-real estate investments | (10.3) | (28.5) | (0.06) | (0.17) | (37.8) | (51.5) | (0.22) | (0.30) |
| Impairment of real estate | (5.7) | (20.6) | (0.03) | (0.12) | (36.5) | (189.2) | (0.22) | (1.11) |

207. The foregoing statements in ¶ 206 were materially false and misleading because the "Impairment of real estate" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

208. The 3Q2024 Earnings Release also described Alexandria's "*Attractive dividend strategy* to share net cash flows from operating activities with stockholders while retaining a significant portion for reinvestment."

209. The foregoing statements in ¶ 208 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

210. The 3Q2024 Earnings Release included a presentation slide titled "*Alexandria's Strong Execution of our Asset Recycling Program*" stating, "Strategic

68

Dispositions and Sales of Partial Interests since 2019" including "$8.7 Billion in Sales" and "$3.0 Billion in Gains."

211. The foregoing statements in ¶ 210 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

212. Also on October 21, 2024, Alexandria filed its Form 10-Q with the SEC for the quarter ended September 30, 2024 ("3Q2024 10-Q"). Defendants Marcus, Moglia and Binda signed the 3Q2024 10-Q and signed the certifications pursuant to SOX, as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein. The SOX certifications include the same language as referred to in ¶ 175.

213. The 3Q2024 10-Q described the "***Ongoing successful execution of Alexandria's 2024 capital strategy***" stating, "We expect to continue pursuing our strategy to fund a significant portion of our capital requirements for the year ending December 31, 2024 with ***dispositions primarily focused on sales of properties and land parcels not integral to our mega campus strategy***."

214. The foregoing statements in ¶ 213 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

215. The 3Q2024 10-Q also stated, "During the nine months ended September 30, 2024, we recognized real estate impairment charges aggregating $36.5 million" and "During the nine months ended September 30, 2023, we recognized real estate impairment charges aggregating $189.2 million."

216. The 3Q2024 10-Q includes charts reporting the same figures for impairment of real estate as reported in the 3Q2024 Earnings Release.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

217.   The foregoing statements in ¶¶ 215-16 were materially false and misleading because the "Impairment of real estate" and "real estate impairment charges" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

218.   The 3Q2024 10-Q also described the Company's "*Attractive dividend strategy* to share net cash flows from operating activities with stockholders while retaining a significant portion for reinvestment."

219.   The foregoing statements in ¶ 218 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

220.   On October 22, 2024, Alexandria held an earnings call with analysts and investors in conjunction with its 3Q2024 financial results, on which Defendants Marcus, Moglia, Binda and Kuhn all spoke. As part of his opening remarks, Defendant Marcus highlighted Alexandria's "*very successful self-funding capital recycling program*" as something that "stands out in this Q3."

221.   As part of his opening remarks, Defendant Binda stated that "Our disposition strategy for 2024 is focused primarily on outright dispositions of non-core assets not integral to our mega campus strategy, allowing us to enhance the quality of our asset base." He added, "With 76% of our annual rental revenue coming from mega campuses today and aspirations to enhance this number over time with non-core dispositions of land and properties, as well as disciplined development and redevelopment on these mega campuses, we expect to continue increasing the quality and resilience of our dominant platform and asset base."

222.   In response to an analyst who asked a question concerning the timeline for the completion of the Company's non-core asset sales that would improve its portfolio quality, Defendant Marcus said, "I don't think you could say the quality of the portfolio

70

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

is going to be substantially improved. It is already first in class, best assets, best location, best services, best tenants. So I don't think how you're thinking about that is quite correct. We have a variety of assets, land, redevelopments, and developments that no longer fit the mega campus strategy, and we'll harvest those assets over the coming years as we deem appropriate to match sources and uses, and also in light of the valuation in the marketplace." Moglia added, "we feel like all the assets we have are good assets, but … we deem some of them to no longer be part of our strategy, and … those are the ones that we're selling in order to fund our pipeline."

223. The foregoing statements in ¶¶ 220-22 were materially false and misleading because (1) the Impaired Properties had already suffered substantial impairments, as a result of impairments, (2) the Company was not able to self-fund through sales of its properties, and (3) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

224. In response to an analyst question regarding how demand would evolve as funding improves, Defendant Marcus said, "80% of our tenants over the last year have come from our own tenants. So we outcompete in those opportunities if we have space available and that's good."

225. The foregoing statements in ¶ 224 were materially false and misleading because macroeconomic factors such as lower demand were hurting the Company by causing impairments to the Impaired Properties

226. Also as part of his opening remarks on the 3Q2024 earnings call, Defendant Binda said, "our high quality cash flows continue to support the growth in our annual common stock dividends with an average annual increase in dividends per share of 5.4% since 2020."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

227.   The foregoing statements in ¶ 226 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

228.   On December 4, 2024, Alexandria hosted a 2024 Investor Day at which Defendants Marcus, Moglia, Binda, Kuhn, and Kass all spoke. As part of his opening remarks, Defendant Moglia said, "support for the strength of our location, scale and sponsorship is our outstanding leasing performance against competitive supply." He added, "We have significantly outperformed competitive supply in South San Francisco, which has been the epicenter of ill-conceived speculative building in the Bay Area." He continued, "In the aftermath of COVID, many inexperienced developers made the critical mistake of thinking they could compete with us by miscalculating just how much location, scale and sponsorship in the form of industry relationships, operational excellence and a strong brand matter to tenants."

229.   As part of his opening remarks, Defendant Binda stated, "We expect to pursue outright dispositions for noncore or core assets not integral to the mega campus strategy."

230.   In response to an analyst who raised Alexandria's disposition strategy for 2025 and asked about the current level of institutional investor interest in allocating funds to Class A life science real estate, Defendant Moglia said, "it's still a fundamentally great investment" and "They're going to need lab space and they're going to come to us to get it." Defendant Kass added, "I think there's we do see general optimism . . . of a long-term opportunity for institutional investors to be in life science, real estate point one." He continued, "the tendency is that there's a flight to quality and investment and we're going to benefit from that over time as we have opportunities to recycle our own capital. I think we're going to see it may not be as deep of a market from an investment perspective, but their quality will really be strong."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

231. The foregoing statements in ¶¶ 228-30 were materially false and misleading because (1) the Impaired Properties, including those in South San Francisco, had already suffered substantial impairments, (2) because of the impairments, the Company was not able to self-fund through sales of its properties, (3) macroeconomic factors were hurting the Company by causing impairments to the Impaired Properties, and (4) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

232. Also on December 4, 2024, Alexandria filed with the SEC a Form 8-K (the "12/4/24" Form 8-K"), signed by Defendant Binda that attached the 2024 Investor Day Presentation ("2024 Investor Day Presentation"). The 2024 Investor Day Presentation included a slide titled "Alexandria Executes on Strategic Dispositions of Non-Core Assets to Fund the Future Growth of our Business Concentrated on our Megacampus Platform," which stated "$2.8B of Dispositions and Sales of Partial Interests."

233. The foregoing statements in ¶ 232 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

234. On January 27, 2025, Alexandria filed with the SEC a Form 8-K, signed by Defendants Marcus, Moglia and Binda that attached a press release issued the same day announcing the Company's 4Q2024 and FY2024 financial results and included supplemental information along with the Company's 4Q2024 and FY2024 presentation slides (collectively, the "4Q2024 and FY2024 Earnings Release").

235. When describing the "***Strong execution of Alexandria's 2024 capital strategy***" the 4Q2024 and FY2024 Earnings Release stated, "Our 2024 capital plan included $1.4 billion in funding from strategic dispositions that focused on a portfolio of diversified assets, of which $1.1 billion was completed during 4Q24."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

236.    The foregoing statements in ¶ 235 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

237.    While discussing Alexandria's "Other key highlights," "Key items included in net income attributable to Alexandria's common stockholders," the 4Q2024 and FY2024 Earnings Release represented the following regarding impairment of real estate:

| (in millions, except per share amounts) | 4Q24 | 4Q23 | 4Q24 | 4Q23 | 2024 | 2023 | 2024 | 2023 |
|---|---|---|---|---|---|---|---|---|
| | Amount | | Per Share – Diluted | | Amount | | Per Share – Diluted | |
| Unrealized (losses) gains on non-real estate investments | $ (79.8) | $ 19.5 | $ (0.46) | $ 0.11 | $(112.2) | $(201.5) | $ (0.65) | $ (1.18) |
| Gain on sales of real estate | 101.8 | 62.2 | 0.59 | 0.36 | 129.3 | 277.0 | 0.75 | 1.62 |
| Impairment of non-real estate investments | (20.3) | (23.1) | (0.12) | (0.13) | (58.1) | (74.6) | (0.34) | (0.44) |
| Impairment of real estate[(1)] | (186.6) | (271.9) | (1.08) | (1.59) | (223.1) | (461.1) | (1.30) | (2.70) |

238.    The foregoing statements in ¶ 237 were materially false and misleading because the "Impairment of real estate" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

239.    The 4Q2024 and FY2024 Earnings Release included a presentation slide titled "***Alexandria's Strong Execution of Capital Recycling Strategy***" stating, "Strategic Dispositions and Sales of Partial Interests 2019-2024" including "$9.6B Total Sales" and "$2.9B Net Gain."

240.    Similarly, a slide titled "2024 Alexandria's Impressive Key Balance Sheet Accomplishments" stated "Capital Recycling through $1.4B of dispositions."

241.    The foregoing statements in ¶¶ 239-240 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

74

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

242.   The 4Q2024 and FY2024 Earnings Release also described Alexandria's "***Attractive dividend strategy*** to share net cash flows from operating activities with stockholders while retaining a significant portion for reinvestment."

243.   The foregoing statements in ¶ 242 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

244.   On January 27, 2025, Alexandria filed its Form 10-K with the SEC for the year ended December 31, 2024 ("2024 10-K"). Defendants Marcus and Moglia signed the 2024 10-K and Defendants Marcus, Moglia and Binda signed the certifications pursuant to SOX, as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein. The SOX certifications include the same language as referred to in ¶ 175.

245.   The 2024 10-K described the "Strong execution of Alexandria's 2024 capital strategy" stating, "Our 2024 capital plan included $1.4 billion in funding from strategic dispositions that focused on a portfolio of diversified assets, of which $1.1 billion was completed during the three months ended December 31, 2024."

246.   The 2024 10-K later added, Alexandria "***Successfully executed our 2024 capital strategy, driven primarily by strategic dispositions that focused on a portfolio of diversified assets.***"

247.   The foregoing statements in ¶¶ 245-46 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

248.   The 2024 10-K also stated. "During the year ended December 31, 2024, we recognized real estate impairment charges aggregating $223.1 million" and "During the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

year ended December 31, 2023, we recognized real estate impairment charges aggregating $461.1 million."

249.    The 2024 10-K includes charts reporting the same figures for impairment of real estate as reported in the 4Q2024 and FY2024 Earnings Release.

250.    The foregoing statements in ¶¶ 248-49 were materially false and misleading because the "Impairment of real estate" and "real estate impairment charges" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

251.    The 2024 10-K also described the Company's "***Attractive dividend strategy*** to share net cash flows from operating activities with stockholders while retaining a significant portion for reinvestment."

252.    The foregoing statements in ¶ 251 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

253.    The 2024 10-K also discussed "[t]rends that may affect our future results." This included that "[t]he new supply, discussed above, combined with high interest rates and reduced market liquidity, may result in a prolonged period of lower property valuations and higher capitalization rates, potentially leading to significant additional real estate impairments."

254.    The foregoing statements in ¶ 253 were materially false and misleading because the Impaired Properties had already suffered substantial impairments. It was particularly misleading for Defendants to raise the issue of potential significant additional real estate impairments without disclosing the substantial impairments that had already taken place.

76

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

255.    On January 28, 2025, Alexandria held an earnings call with analysts and investors in conjunction with its 4Q2024 and FY24 financial results, on which Defendants Marcus, Moglia, Binda and Kuhn all spoke.

256.    As part of his opening remarks, Defendant Binda said, "as we reflect on the fourth quarter and the full year of 2024, we're pleased with the tremendous execution with solid FFO growth of 5.6% in a very tough macroeconomic environment. With our tremendous scale, high quality cash flows, deep industry relationships, and our highly experienced management team, we're well-positioned to continue reinforcing our dominant platform and strategically position [ourselves] for future growth." Defendant Binda also added, "In the fourth quarter, we did recognize impairments aggregating $186 million."

257.    As part of his opening remarks, Defendant Moglia said, "strategic dispositions exemplified that we continue to have a very solid portfolio of diversified assets, providing us with strategic optionality."

258.    In response to an analyst question regarding the venture capital funding environment and whether Alexandria "need[s] to see a greater increase in capital flows to the more start-up type [of] tenants" "in order to see the cadence of leasing pick up," Defendant Kuhn said, "We've really built a very diverse set of tenants to help enable, right, kind of broad demand as the market conditions change. And I would say, from a funding perspective, it has come down off the peak of '21, and we're looking at, I would say, a pretty strong funding environment going into '25. There's a lot of dry capital that venture investors have on hand to deploy."

259.    The foregoing statements in ¶¶ 256-58 were materially false and misleading because (1) the Impaired Properties had already suffered substantial impairments, (2) because of the impairments, the Company was not able to self-fund through sales of its

properties, and (3) macroeconomic factors were hurting the Company by causing impairments to the Impaired Properties.

260.    As part of his opening remarks during the January 28, 2025 earnings call, Defendant Binda said, "Our high quality cash flows continue to support the growth in our common stock dividends with an average annual increase in dividends per year of 5.4% since 2020."

261.    The foregoing statements in ¶ 260 were materially false and misleading because the Company was unable to maintain the strength of its dividend because of its impairments to the Impaired Properties.

262.    On April 2, 2025, Alexandria filed with the SEC an Annual Report to Security Holders ("2024 Annual Report") in which Defendants Marcus, Moglia and Binda contributed. As part of the 2024 Annual Report, Defendant Marcus submitted a letter in which he stated, "Alexandria also continued to execute on our capital recycling program to decrease the size of our land bank, exit non-core assets, and focus on our Megacampus strategy. This year, we successfully completed $1.4 billion in dispositions, unlocking important capital to reinvest into our development and redevelopment projects in a highly strategic and disciplined manner."

263.    As part of the 2024 Annual Report, Defendant Moglia submitted a letter in which he stated, "We continue to be focused on our disciplined funding strategy to recycle capital from dispositions and to minimize the issuance of common stock, which has been nominal over the last two years. Our team has an unrivaled and longstanding track record of monetizing embedded asset value." He also stated, "In 2024, we completed $1.4 billion in dispositions that primarily were not core to our Megacampus strategy, unlocking important capital for reinvestment into our development and redevelopment projects. As presented at our Investor Day in December 2024, these dispositions demonstrate that we continue to have a very solid portfolio of diversified assets that afford us strategic

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

optionality." He continued, "We are confident in our ability to meet our self-funding goal through our asset recycling program and to continue to evolve our asset base through our Megacampus strategy, providing the location, scale, and sponsorship that today's high-quality tenants prioritize."

264. The foregoing statements in ¶¶ 262-63 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

265. Further, Defendant Marcus's letter in the 2024 Annual Report stated, "Alexandria's unrivaled tenant base continued to generate stable, strong, and long-duration cash flows that support an attractive and well-covered dividend with a yield of 5.4%."

266. The foregoing statements in ¶ 265 were materially false and misleading because the Company was unable to maintain the strength of its dividend because of its impairments to the Impaired Properties.

267. The 2024 Annual Report also contained a copy of the 2024 10-K that the Company previously filed on January 27, 2025 and contained all of the statements that were materially false and misleading for the reasons discussed above.

268. On April 28, 2025, Alexandria filed with the SEC a Form 8-K, signed by Defendants Marcus, Moglia and Binda that attached a press release issued the same day announcing the Company's 1Q2025 financial results and included supplemental information along with the Company's 1Q2025 presentation slides (collectively, the "1Q2025 Earnings Release").

269. When describing the "Ongoing execution of Alexandria's 2025 capital recycling strategy" the 1Q2025 Earnings Release stated, "We plan to continue funding a significant portion of our capital requirements for the year ending December 31, 2025

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

through dispositions of non-core assets, land, partial interest sales, and sales to owner/users."

270. The foregoing statements in ¶ 269 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

271. While discussing Alexandria's "Other key highlights," "Key items included in net income attributable to Alexandria's common stockholders," the 1Q2025 Earnings Release represented the following regarding impairment of real estate:

| (in millions, except per share amounts) | 1Q25 Amount | 1Q24 Amount | 1Q25 Per Share – Diluted | 1Q24 Per Share – Diluted |
|---|---|---|---|---|
| Unrealized (losses) gains on non-real estate investments | $ (68.1) | $ 29.2 | $ (0.40) | $ 0.17 |
| Gain on sales of real estate | 13.2 | 0.4 | 0.08 | — |
| Impairment of non-real estate investments | (11.2) | (14.7) | (0.07) | (0.09) |
| Impairment of real estate[1] | (32.2) | — | (0.19) | — |

272. The foregoing statements in ¶ 271 were materially false and misleading because the "Impairment of real estate" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

273. The 1Q2025 Earnings Release included a presentation slide titled "Alexandria's Historically Consistent, Strong, and Increasing Dividends," highlighting Alexandria's "5.7% Dividend Yield" and "4.5% Average Annual Dividend Per-Share Growth."

274. The foregoing statements in ¶ 273 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

275. Also on April 28, 2025, Alexandria filed its Form 10-Q with the SEC for the quarter ended March 31, 2025 ("1Q2025 10-Q"). Defendants Marcus, Moglia and Binda signed the 1Q2025 10-Q and signed the certifications pursuant to SOX, as the Principal

80

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

Executive Officers of the Company, attesting to the accuracy of the statements therein. The SOX certifications include the same language as referred to in ¶ 175.

276.   The 1Q2025 10-Q described the "Ongoing execution of Alexandria's 2025 capital recycling strategy" stating, "We plan to continue funding a significant portion of our capital requirements for the year ending December 31, 2025 through dispositions of non-core assets, land, partial interest sales, and sales to owner/users."

277.   The foregoing statements in ¶ 276 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

278.   The 1Q2025 10-Q also stated, "During the three months ended March 31, 2025, we recognized an impairment charge aggregating $32.2 million."

279.   The 1Q2025 10-Q includes charts reporting the same figures for impairment of real estate as reported in the 1Q2025 Earnings Release.

280.   The foregoing statements in ¶¶ 278-79 were materially false and misleading because the "Impairment of real estate" and "impairment charge" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

281.   The 1Q2025 10-Q also described the Company's "Dividend strategy to share net cash flows from operating activities with stockholders while retaining a significant portion for reinvestment."

282.   The foregoing statements in ¶ 281 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

81

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

283.    On April 29, 2025, Alexandria held an earnings call with analysts and investors in conjunction with its 1Q2025 financial results, on which Defendants Marcus, Moglia, Binda and Kuhn all spoke.

284.    As part of his opening remarks, Defendant Moglia said, "competitive supply deliveries are winding down and we're making good progress on our asset harvesting and recycling program." Similarly, while discussing Alexandria's "asset recycling program," Defendant Moglia also said, "The team continues to be strategic and opportunistic in identifying non-core asset dispositions including land and partial interest sales to self-fund our high-quality development and redevelopment pipeline that is transforming our asset base into predominantly mega campuses."

285.    In response to an analyst who reiterated Defendant Marcus' prepared remarks about Alexandria's history of "sometimes doing the right thing at the worst time" and questioned what "the right thing" for Alexandria is now and when the Company expects "to see the payoff from it," Defendant Marcus explained that the Company "won't hesitate" to acquire new properties "as we continue to sell off non-core assets and enhance our mega campus ARR percentage."

286.    When responding to another analyst who asked a question regarding how capital markets are holding up, how confident the Company is that dispositions in progress will close, and the buyer pool, Defendant Marcus said, "There's a pretty healthy demand out there for land that we hold in really great locations for [the] highest and best use [as] residential. And I think you'll continue to see that. And that buyer pool has only expanded, not shrunk. I think there's still good opportunities and we've done some . . . sell[ing] to owner users. And then we do feel that given, good quality, non-core workhorse assets, as Peter has kind of coined the term, there still is a buyer pool for that."

287.    Also in response to an analyst's question on this call regarding whether Alexandria would consider selling $2-3 billion in assets and then doing a big buyback,

82

Defendant Marcus said, "We're continuing to sell workhorse noncore assets, and those are important because those help us further enhance our focus on revenue from the mega campus environment."

288. The foregoing statements in ¶¶ 284-87 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

289. As part of his opening remarks on the 1Q2025 earnings call, Defendant Marcus said, "Alexandria is one of the strongest and safest dividends in the REIT sector with a very low payout ratio."

290. Defendant Binda also stated on this call that "Our high-quality cash flows continue to support our common stock dividends with a conservative FFO payout ratio of 57% for 1Q '25 and an attractive dividend yield of 5.7% as of the end of 1Q."

291. The foregoing statements in ¶¶ 289-290 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

292. On July 21, 2025, Alexandria filed with the SEC a Form 8-K, signed by Defendants Marcus, Moglia and Binda that attached a press release issued the same day announcing the Company's 2Q2025 financial results and included supplemental information along with the Company's 2Q2025 presentation slides (collectively, the "2Q2025 Earnings Release").

293. When describing the "Ongoing execution of Alexandria's 2025 capital recycling strategy," the 2Q2025 Earnings Release stated, "We expect to fund a significant portion of our capital requirements for the year ending December 31, 2025 through dispositions of non-core assets, land, partial interest sales, and sales to owner/users."

83

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

294. The foregoing statements in ¶ 293 were materially false and misleading because (1) as a result of impairments, the Company was not able to self-fund through sales of its properties and (2) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

295. While discussing Alexandria's "Other key highlights," "Key items included in net income attributable to Alexandria's common stockholders," the 2Q2025 Earnings Release represented the following regarding impairment of real estate:

| (in millions, except per share amounts) | 2Q25 Amount | 2Q24 Amount | 2Q25 Per Share – Diluted | 2Q24 Per Share – Diluted | 1H25 Amount | 1H24 Amount | 1H25 Per Share – Diluted | 1H24 Per Share – Diluted |
|---|---|---|---|---|---|---|---|---|
| Unrealized losses on non-real estate investments | $ (21.9) | $ (64.2) | $ (0.13) | $ (0.37) | $ (90.1) | $ (35.1) | $ (0.53) | $ (0.20) |
| Gain on sales of real estate | — | — | — | — | 13.2 | 0.4 | 0.08 | — |
| Impairment of non-real estate investments | (39.2) | (12.8) | (0.23) | (0.08) | (50.4) | (27.5) | (0.30) | (0.16) |
| Impairment of real estate[(1)] | (129.6) | (30.8) | (0.76) | (0.18) | (161.8) | (30.8) | (0.95) | (0.18) |

296. The foregoing statements in ¶ 295 were materially false and misleading because the "Impairment of real estate" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

297. The 2Q2025 Earnings Release included a presentation slide titled "Alexandria's Historically Consistent and Solid Dividends," highlighting Alexandria's 2Q25 "7.3% Dividend Yield" and "57% Dividend Payout Ratio."

298. The foregoing statements in ¶ 297 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

299. Also on July 21, 2025, Alexandria filed its Form 10-Q with the SEC for the quarter ended June 30, 2025 ("2Q2025 10-Q"). Defendants Marcus, Moglia and Binda signed the 2Q2025 10-Q and signed the certifications pursuant to SOX, as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein. The SOX certifications include the same language as referred to in ¶ 175.

84

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

300.   The 2Q2025 10-Q described the "Ongoing execution of Alexandria's 2025 capital recycling strategy" stating, "We expect to fund a significant portion of our capital requirements for the year ending December 31, 2025 through dispositions of non-core assets, land, partial interest sales, and sales to owner/users."

301.   The foregoing statements in ¶ 300 were materially false and misleading because as a result of impairments, the Company was not able to self-fund through sales of its properties and the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

302.   The 2Q2025 10-Q also stated, "During the six months ended June 30, 2025, we recognized impairment of real estate aggregating $161.8 million" and "During the three months ended June 30, 2025, we recognized impairment charges aggregating $129.6 million."

303.   The 2Q2025 10-Q includes charts reporting the same figures for impairment of real estate as reported in the 2Q2025 Earnings Release.

304.   The foregoing statements in ¶¶ 302-03 were materially false and misleading because the "Impairment of real estate" and "impairment charges" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments.

305.   The 2Q2025 10-Q described Alexandria's "Dividend strategy to share net cash flows from operating activities with stockholders while retaining a significant portion for reinvestment."

306.   The foregoing statements in ¶ 305 were materially false and misleading because the Company was unable to maintain the strength of its dividend as a result of its impairments to the Impaired Properties.

307. The 2Q2025 10-Q also discussed "[t]rends that may affect our future results." This included that "[t]he new supply, discussed above, combined with high

85

interest rates and reduced market liquidity, may result in a prolonged period of lower property valuations and higher capitalization rates, potentially leading to significant additional real estate impairments and making it more challenging to execute asset sales within expected timelines."

308. The foregoing statements in ¶ 307 were materially false and misleading because (1) the Impaired Properties had already suffered substantial impairments and (2) because of the impairments, the Company was not able to self-fund through sales of its properties. It was particularly misleading for Defendants to raise the issue of potential significant additional real estate impairments without disclosing the substantial impairments that had already taken place.

309. On July 22, 2025, Alexandria held an earnings call with analysts and investors in conjunction with its 2Q2025 financial results, on which Defendants Marcus, Moglia, Binda and Kuhn all spoke. As part of his opening remarks, Defendant Binda said, "In connection with our disposition program, we recognized impairments of real estate of $129.6 million during the quarter."

310. When responding to an analyst question on this 2Q2025 earnings call regarding "the type of assets you guys are selling and that being sort of non-core potentially with some near-term lease roll here on it," Defendant Moglia said, "So it's really asset specific and we just have a lot of assets in transition in what we're trying to sell. And one of the reasons [is] that they're non-core, and they're not on Megacampuses."

311. The foregoing statements in ¶¶ 309-10 were materially false and misleading because the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

312. On October 27, 2025, Alexandria filed with the SEC a Form 8-K, signed by Defendants Marcus, Moglia and Binda that attached a press release issued the same day announcing the Company's 3Q2025 financial results and included supplemental

86

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

information along with the Company's 3Q2025 presentation slides (collectively, the "3Q2025 Earnings Release").

313. Whie Defendants began at this point to reveal the nature of the Company's impairments, they continued to misrepresent the full scope of the Impaired Properties and the properties that the Company's was selling as part of its disposition plan.

314. When describing the "Ongoing execution of Alexandria's 2025 capital recycling strategy," the 3Q2025 Earnings Release stated, "We expect to fund a significant portion of our capital requirements for the year ending December 31, 2025 through dispositions of non-core assets, land, partial interest sales, and sales to owner/users." When describing the update to its guidance range for "net (loss) income per share," the 3Q2025 Earnings Release stated, "Potential additional impairments of real estate (including impairments on stabilized and non-stabilized properties and land) that may be recognized in 4Q25 ranging from $0 to $685 million, related to assets that could potentially be sold in 4Q25 or 2026, and if such assets meet the held for sale criteria in 4Q25, considering market factors, buyer ability to perform, our desire to proceed with a sale at a particular price, and other factors."

315. While discussing Alexandria's "Other key highlights," "Key items included in net income attributable to Alexandria's common stockholders," the 3Q2025 Earnings Release represented the following regarding impairment of real estate:

| | | | | | YTD | | | |
|---|---|---|---|---|---|---|---|---|
| | 3Q25 | 3Q24 | 3Q25 | 3Q24 | 3Q25 | 3Q24 | 3Q25 | 3Q24 |
| (in millions, except per share amounts) | Amount | | Per Share – Diluted | | Amount | | Per Share – Diluted | |
| Unrealized gains (losses) on non-real estate investments | $ 18.5 | $ 2.6 | $ 0.11 | $ 0.02 | $ (71.6) | $ (32.5) | $ (0.42) | $ (0.19) |
| Gain on sales of real estate | 9.4 | 27.1 | 0.06 | 0.16 | 22.5 | 27.5 | 0.13 | 0.16 |
| Impairment of non-real estate investments | (25.1) | (10.3) | (0.15) | (0.06) | (75.5) | (37.8) | (0.45) | (0.22) |
| Impairment of real estate[1] | (323.9) | (5.7) | (1.90) | (0.03) | (485.6) | (36.5) | (2.85) | (0.22) |

87

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

316.   The foregoing statements in ¶¶ 314-15 were materially false and misleading because (1) the "Impairment of real estate" and potential additional impairments that the Company disclosed did not account for the Impaired Properties that had already suffered substantial impairments, (2) as a result of the impairments, the Company was not able to self-fund through sales of its properties, and (3) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

317.   Also on October 27, 2025, Alexandria filed its Form 10-Q with the SEC for the quarter ended September 30, 2025 ("3Q2025 10-Q"). Defendants Marcus, Moglia and Binda signed the 3Q2025 10-Q and signed the certifications pursuant to SOX, as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein. The SOX certifications include the same language as referred to in ¶ 175.

318.   The 3Q2025 10-Q described the "Ongoing execution of Alexandria's 2025 capital recycling strategy" stating, "We expect to fund a significant portion of our capital requirements for the year ending December 31, 2025 through dispositions of non-core assets, land, partial interest sales, and sales to owner/users."

319.   The 3Q2025 10-Q also stated, "During the nine months ended September 30, 2025, we recognized impairment charges aggregating $485.6 million" and "During the three months ended September 30, 2025, we recognized impairment charges aggregating $323.9 million."

320.   The 3Q2025 10-Q includes charts reporting the same figures for impairment of real estate as reported in the 3Q2025 Earnings Release.

321.   The foregoing statements in ¶¶ 318-20 were materially false and misleading because (1) "Impairment of real estate" and "impairment charges" that the Company recognized did not account for the Impaired Properties that had already suffered substantial impairments, (2) the Company was not able to self-fund through sales of its

88

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

properties, and (3) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy.

322. The 3Q2025 10-Q also discussed "[t]rends that may affect our future results." This included that "[t]he new supply, discussed above, combined with high interest rates and reduced market liquidity, has resulted in a prolonged period of lower property valuations and higher capitalization rates, potentially leading to significant additional real estate impairments and making it more challenging to execute asset sales within expected timelines and at favorable pricing." It added, "As of September 30, 2025, we have evaluated a large number of potential disposition targets under a probability-weighted method, including under the held and used and held for sale models. In each case, no impairment charge was required. If these specific assets meet the criteria to be designated as held for sale during the fourth quarter of 2025, we may incur impairments ranging from $0 to $685 million."

323. The foregoing statements in ¶ 322 were materially false and misleading because the (1) Impaired Properties had already suffered substantial impairments and (2) because of the impairments, the Company was not able to self-fund through sales of its properties. It was particularly misleading for Defendants to raise the issue of potential significant additional real estate impairments without disclosing the substantial impairments that had already taken place. It was also incorrect that "no impairment charge was required" under "a probability-weighted method, including under the held and used and held for sale models" for the Company's disposition targets.

324. On October 28, 2025, Alexandria held an earnings call with analysts and investors in conjunction with its 3Q2025 financial results, on which Defendants Marcus, Moglia, Binda and Kuhn all spoke. As part of his opening remarks, Defendant Binda said, "In connection with our disposition program, we recognized impairments of real estate of

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

$323.9 million during the quarter, with approximately 2/3 of that coming from an investment in our Long Island City redevelopment property."

325. In response to an analyst question regarding the potential for $685 million of impairments and what type of assets they involve, Defendant Binda said, "I would say the bigger chunk there has to do with land-type assets."

326. In response to an analyst question regarding whether the Company has any desire to sell partial interest in any of its Megacampuses "given it still seems like there'd be a strong bid or depth of demand for that type of product today," Defendant Marcus said, "Well, I don't think that is our game plan because I think over time, our goal is actually to own more of the Megacampus[es] rather than less. But I think there are a variety of campuses. Some are at the absolute upper end, some are in the medium to high end. So it's a matter of selection there and some we already have partners on. But I don't think that's necessarily the key game plan. Our key game plan is to rid the balance sheet of a whole lot of non-income-producing property and reduce our exposure to noncore assets to as minimal as we can. I think that's the core strategy here."

327. The foregoing statements in ¶¶ 324-26 were materially false and misleading because (1) the Impaired Properties had already suffered substantial impairments, (2) because of the impairments, the Company was not able to self-fund through sales of its properties, and (3) the Company was planning to sell properties that were impaired regardless of whether they were part of its Megacampus strategy or "nonincome-producing" properties.

## VI.   THE TRUTH EMERGES

328. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

329. Throughout the Class Period, the price of Alexandria securities were artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

330. The price of Alexandria securities significantly declined when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Alexandria securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

331. In particular, on October 27, 2025, after the market closed, Alexandria issued its 10-Q for the third quarter of 2025 and a press release announcing the Company's 3Q 2025 financial results. In the press release, Alexandria announced real estate impairments totaling $323.87 million for the third quarter, stating the figure:

> Primarily represents impairment charges to reduce the carrying amount of our investments in real estate assets to their respective estimated fair values less costs to sell upon their classification as held for sale in 3Q25, including (i) $206.2 million related to our only property located in Long Island City, in our New York City market, which was a full building conversion to laboratory/office space and is currently 52% occupied, (ii) $43.4 million related to a retail shopping center at 550 Arsenal Street that was originally intended to be a life science development in our Cambridge/Inner Suburbs submarket that was sold in October 2025, (iii) $31.8 million related to a vacant property that would require significant re-leasing capital in our Research Triangle submarket, and (iv) $27.8 million related to land parcels in our Sorrento Mesa submarket.

332. Additionally, in the press release, when discussing "key changes to our 2025 guidance," Alexandria stated:

> 1) The midpoint of our guidance range for 2025 net (loss) income per share was reduced by $3.44 from $0.50 to $(2.94). In addition to the items discussed in item 2 below, the update to our guidance range for 2025 net (loss) income per share includes the following:

91

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

- Potential additional impairments of real estate (including impairments on stabilized and non-stabilized properties and land) that may be recognized in 4Q25 ranging from $0 to $685 million, related to assets that could potentially be sold in 4Q25 or 2026, and if such assets meet the held for sale criteria in 4Q25, considering market factors, buyer ability to perform, our desire to proceed with a sale at a particular price, and other factors.
- Potential additional gain on sales of real estate that may be recognized in 4Q25 ranging from $0 to $240 million related to assets that may be sold in 4Q25.
- These potential impairments and gains on sales of real estate will not impact our funds from operations per share pursuant to the Nareit definition of funds from operations.

333. The 10-Q for the third quarter of 2025 also disclosed that:

During the three months ended September 30, 2025, we recognized impairment charges aggregating $323.9 million, which primarily included the following [among three smaller impairments that it also listed]:

•Impairment charge of $206.2 million was recognized to reduce the carrying amount of a non-Megacampus property aggregating 179,100 RSF in Long Island City, a non-core location within our New York City submarket, to its estimated fair value less costs to sell of approximately $31.1 million upon meeting the criteria for classification as held for sale. This property met the held for sale criteria in September 2025, when we committed to dispose of it following our reevaluation of its alignment with our Megacampus strategy and decided to allocate sales proceeds toward other projects with higher value-creation opportunities. As of September 30, 2025, the property is 52% occupied. We expect to complete the sale of this property within the next 12 months.

334. During the accompanying earnings call held at 2 pm EDT on October 28, 2025, CFO Binda elaborated on these setbacks, highlighting that:

*We've completed $508 million of dispositions to date, which leaves $1 billion to complete in the fourth quarter, all of which are subject to non-fundable deposits, signed LOIs or purchase and sale negotiations. In connection with our disposition program, we*

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

*recognized impairments of real estate of $323.9 million during the quarter, with approximately 2/3 of that coming from an investment in our Long Island City redevelopment property.*

Three items to highlight here. First, we acquired the site in 2018. That submarket suffered a substantial setback when Amazon abandoned its plan for new HQ in that location in 2019 and it never recovered. Second, despite the lower rental rate price point and our dominance in that submarket, it has been challenging to get a critical mass of life science tenants to go to this location. *And ultimately, we don't view it as a life science destination that can scale. And third, this location has become more of an industrial flex and cinema submarket rather than life science.*

Ultimately, at the end of September, we decided future capital needs and the sale proceeds related to this project would be better recycled into our Megacampuses where we have greater conviction long term. *Looking forward, we have a number of assets under consideration for sale either by the end of this year or sometime in 2026 that have estimated values below our carrying values ranging from $0 to $685 million. Although these potential impairments have not been triggered and final decisions to proceed have not been made, we updated our guidance range for 2025 to reflect these potential additional impairments in the fourth quarter.* We anticipate an end to the large-scale non-core asset program by the end of 2026 or early 2027. We also expect dispositions to provide the vast majority of our capital needs for next year.

335.   On the same earnings call, in response to an analyst question regarding the Company's dividend policy, Defendant Marcus said:

Well, the Board will look at that in the fourth quarter and declare a fourth quarter dividend. I think what we want to do is try to be able to frame 2026, I think, very, very clearly, and we'll try to do that to the Street as quickly as we can. *But I think that frame then impacts how the Board will think about the metrics of dividend*. But remember, that's our cheapest form of capital, so we are focused on that.

336.   The Company's stock price fell dramatically in response to this news announced after the market closed on October 27, 2025 and on the earnings call on

93

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

October 28, 2025, dropping 19.17%, or $14.93 per share, to close at $62.94 per share on October 28, 2025 (from a closing price of $77.87 on October 27, 2025), on unusually heavy trading volume that was 5.3 times the 20-day moving average.

337. The Company's stock price continued to fall the next day in response to this news, dropping 6.64%, or $4.18 per share, to close at $58.76 per share on October 29, 2025 (from a closing price of $62.94 on October 28, 2025), on unusually heavy trading volume that was 2.72 times the 20-day moving average.

338. The Company's stock price also continued to fall on October 30, 2025 in response to this news, dropping 4.07%, or $2.39 per share, to close at $56.37 (from a closing price of 58.76 on October 29, 2025), on unusually heavy trading volume that was 2.56 times the 20-day moving average.

339. Cumulatively, from the close of the market on October 27, 2025 through the close of the market on October 30, 2025, the Company's stock price fell 27.61%, or $21.50 (from a closing price of $77.87 on October 27, 2025 to a closing price of $56.37 on October 30, 2025).

340. In its October 28, 2025 report, Citi emphasized that "ARE may look to continue to sell non-core assets and, notably, ARE expects to 'carefully evaluate' its 2026 dividend strategy." The report added that "Construction spending in 2026 is expected to be similar/slightly higher than the $1.75B midpoint of 2025 guidance, which could require equity-type capital to maintain its leverage profile, and ARE expects a significant source of funding to come from non-core asset sales in 2026." When discussing "Implications," the report stated, "We expect the earnings miss, lowered 2025 guidance, evaluation of ARE's dividend strategy, and 2026 earnings considerations, which in our view underscore continued softness in life science fundamentals, could weigh on shares in tomorrow's trading."

94

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

341. Despite this news, Defendants continued to misrepresent the extent and nature of the impairments to the Impaired Properties and the Company's disposition program. *See supra* ¶¶ 312-27.

342. Then, on December 3, 2025, before the market opened, Alexandria filed a Form 8-K with the SEC that included a release titled "2025 Update and 2026 Guidance," in conjunction with the Company's 2025 Investor Day. As part of the "2025 Update and 2026 Guidance," Alexandria announced ***$1.3 billion in real estate impairments***, including the $685 million in impairments that it previously described as merely a potential and $588 million of additional real estate impairments, stating:

> Subsequent to October 27, 2025, and as of December 3, 2025, we made progress finalizing the Company's 2025 capital plan and established an initial 2026 capital plan to fund 2026 construction through the sale of land, as well as stabilized, and non-stabilized non-core real estate assets, and sales of partial interests. As a result, as of December 3, 2025, with the requisite authority and intent, we made strategic decisions to dispose of a number of real estate assets. ***Consequently, the identified assets met the criteria for classification as held for sale, and we recognized impairment charges with our share aggregating approximately $1.3 billion***. ***This amount comprises approximately $685 million of impairment charges previously disclosed as potential 4Q25 impairments, as discussed above, and approximately $588 million of additional real estate impairments primarily related to the disposition targets identified after October 27, 2025 and approved for sale by December 3, 2025, with expected sales completion in 2025 and 2026***.

> The midpoint of our guidance range for 2025 net (loss) income per share was reduced by $5.64 from $(2.94) to $(8.58) compared to our 2025 guidance disclosed on October 27, 2025, primarily to reflect additional real estate impairments aggregating $588 million described above.

> ***Our share of real estate impairments aggregating $1.3 billion recognized in connection with assets classified as held for sale subsequent to October 27, 2025 and as of December 3, 2025, and***

95

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

Case 2:25-cv-11319-GW-AGR    Document 68    Filed 04/15/26    Page 99 of 116   Page ID #:879

*expected to be sold in December 2025 or 2026*, consisted of the following:

- *Impairment charge of $335.0 million was recognized to reduce the carrying amount of a future development project aggregating 1.1 million SF, which represents our sole remaining asset in the SoMa submarket*, to its estimated fair value of approximately $75.0 million less costs to sell. We acquired this asset in January 2017, with the intent to develop the property for laboratory and/or advanced technology space. In March 2019, we executed a build-to-suit lease with an anchor tenant, Pinterest, Inc. In August 2020, we received an $89.5 million lease termination payment from Pinterest, Inc. upon termination of its lease prior to commencement of development. Management's decision not to proceed with the project was due to the macroeconomic outlook and our strategy to recycle capital into projects with greater value-creation potential. This asset has been entitled for residential use and we have commenced a program to market this property to residential developers.

- *Impairment charge of $208.0 million, representing our share, was recognized to reduce the carrying amounts of seven properties owned by our consolidated real estate joint venture at a Megacampus in our South San Francisco submarket*, to their estimated fair values aggregating approximately $282.0 million less costs to sell. As of September 30, 2025, we hold a 50% ownership interest in six of these properties and a 51% interest in the remaining property. The decision to sell these certain Megacampus assets followed a reevaluation of the project's financial outlook and the capital required to lease vacant space and redevelop certain properties, leading to our strategic decision to reinvest the sales proceeds toward other projects with greater value-creation opportunities.

- *Impairment charge of $150.0 million, representing our share, was recognized to reduce the carrying amount of multiple land parcels aggregating 1.0 million of future development RSF owned by a consolidated real estate joint venture in our Seaport Innovation District submarket*, to

96

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

their estimated fair values aggregating approximately $33.5 million less costs to sell. As of September 30, 2025, we hold a 60% ownership interest in the land parcels. These industrial- and retail-zoned land parcels were originally acquired with the intent to develop laboratory space. The decision not to proceed with the project reflects a lack of tenant demand for laboratory space in the Seaport Innovation District submarket, and our strategy to recycle capital into projects with greater value-creation potential.

- *Impairment charge of $145.0 million was recognized to reduce the carrying amount of one operating office property and land parcel aggregating 478,000 SF in our Greater Stanford submarket*, to their estimated fair values aggregating approximately $140.0 million less costs to sell. We acquired these assets in 2019 with the intent to redevelop them for life science use. However, following a reassessment of the project's financial outlook and the significant capital required, we commenced a program to market this site to residential developers.

- *Impairment charge of $107.0 million was recognized to reduce the carrying amounts of 10 non-Megacampus properties aggregating 788,146 RSF, located in our Canada market*, to their estimated fair values aggregating approximately $142.5 million less costs to sell. This decision reflects our assessment that the next phase of value creation for these assets would require significant capital investment to generate leasing activity, our strategic decision to reinvest the sales proceeds toward other projects with greater value-creation opportunities, as well as our decision to exit the Montreal submarket. The disposition of these properties will represent our complete exit from the Montreal submarket, leaving us with only one remaining asset in the Canadian market. This disposition does not represent a strategic shift and therefore does not meet the criteria for classification as a discontinued operation.

- *Impairment charge of $105.0 million was recognized to reduce the carrying amount of a redevelopment project under construction as of September 30, 2025, aggregating 104,956 RSF in our Cambridge submarket*, to its estimated

97

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

fair value of approximately $70.0 million less costs to sell. This asset was originally acquired with the intent to expand our Alexandria Center® at One Kendall Square Megacampus, but the capital necessary to complete the redevelopment will be significant. The decision to sell this asset was driven by the project's financial outlook and the capital required to complete the redevelopment and lease the property, leading to our strategic decision to reinvest the sales proceeds, and other capital necessary to lease the property, toward other projects with greater value-creation opportunities.

343. In the same "2025 Update and 2026 Guidance" release, Alexandria announced a 45% reduction in its quarterly dividend stating:

> *2026 Dividends and net cash provided by operating activities after dividends*
>
> In December 2025, **our Board of Directors declared a quarterly cash dividend of $0.72 per common share for 4Q25, representing a 45% reduction from the quarterly dividend declared of $1.32 for 3Q25**. The decision to reduce the declared dividend per common share reflects our commitment to maintaining the strength of our balance sheet, enhancing financial flexibility, and preserving liquidity of approximately $410 million on an annual basis, which will be used to support our 2026 capital plan.

344. Defendant Binda explained on the 2025 Investor Day conference call that the Company "expect[ed] to solve [its] $2.7 billion funding need with 2 strategies. First, our Board approved a reduction of the dividend of 45% today, which will generate an additional $410 million of capital that can be used to address our funding needs. And then second, we plan to address the $2.3 billion remainder with both dispositions of noncore assets and land, and sales of partial interest of core assets."

345. The Company's stock price fell that day in response to this news, dropping 10.05%, or $5.41 per share, to close at $48.42 per share on December 3, 2025 (from a closing price of $53.83 on December 2, 2025), on unusually heavy trading volume that was 2.69 times the 20-day moving average.

98

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

346. The Company's stock price continued to fall the next day in response to this news dropping 3.78%, or $1.83 per share, to close at $46.59 per share on December 4, 2025 (from a closing price of $48.42 on December 3, 2025), on unusually heavy trading volume that was 1.77 times the 20-day moving average.

347. The Company's stock price also continued to fall on December 5, 2025, dropping 2.38%, or $1.11 per share, to close at $45.48 per share (from a closing price of $46.59 on December 4, 2025), on unusually heavy trading volume that was 1.72 times the 20-day moving average. Cumulatively, from the close of the market on December 2, 2025 through the close of the market on December 5, 2025, the Company's stock price fell 15.51%, or $8.35 per share (from a closing price of $53.83 per share on December 2, 2025 to a closing price of $45.48 per share on December 5, 2025).

348. Market analysts reacted immediately to this surprising negative news. On December 3, 2025, Citi published a report stating, "ARE lowered 2026 FFO guidance by 15c / -2.3% at the midpoint to $6.40, to a range of $6.25 to $6.55 (from $6.25 to $6.85)." The report attributed the Company's FFO guidance reduction in part to "dispositions." While discussing Alexandria's dividend reduction the report stated, "While a dividend reduction was largely anticipated, the magnitude was larger than expected – we recently conducted a survey on ARE's dividend and only ~14% of respondents expected a reduction of greater than 40%." The report concluded by stating, "We are lowering our target price to $52 from $61, reflecting a ~9x multiple on our revised 2027 estimate to reflect the delayed recovery in life science fundamentals reflected in our lowered 2027 estimate."

349. Similarly, on the same day, J.P.Morgan published a report titled "Investor Day: Tougher Business Conditions, Will Take a While to Recover." The report stated, "One of the bigger items that we think negatively impacted the stock today was that it lowered guidance for 2026" and "The change was driven by its plan to sell more assets

99

and sooner." The report concluded by stating, "At this juncture, with management pointing to a challenging business backdrop and significant dispositions, there is an even chance of 2027 FFO being below \$6/share as it is above that level, in our view."

350.    On December 4, 2025, Evercore ISI published a report titled "Investor Day – Sluggish Demand & Disposition Program Pull Down Estimates." The report explained that the Company's disposition program was surprising because "the company outlined their goal to sell between \$2.1bn and \$3.7bn in 2026 vs. our prior estimate of \$1.9bn." In addition to the 2026 dispositions being \$1 billion higher than the prior estimate, the type of assets being sold was surprising because Evercore "previously modeled that most of the assumed \$1.9bn in dispos would hit later in the year at materially lower cap rates. We previously assumed a larger share of the dispos would be related to non-income producing assets / future development opportunities / land banks etc., which is the main dilutive impact to our '26 FFO number." The Company's unexpected increase in the amount, and change in type, of properties it was selling negatively impacted its expected earnings as far out as 2027, and required a larger-than-expected reduction in its dividend, because it would have a lower revenue base as a result these sales. As Evercore explained regarding the Company's earnings trajectory, "While our estimate for 4Q26 only marginally changed (\$1.52 vs. \$1.58 previously), the composition of earnings is materially different. Previously, the decline into '26 was mainly driven by burn off of capitalized costs plus some operating portfolio weakness, which then would have reversed partially in '27 with the sale of non-income producing assets out of the future development pipeline (savings from reducing associated expenses from these assets). After updating the model and digesting the investor day information, we now model that the main dilution next year is coming from selling core/non-core assets at 8.5% - 9.5% and some land, which is more dilutive than our previous assumption. The burn off of capitalized costs is less steep for next year but is now expected to continue into '27 as the real estate basis at the end of '26

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

is likely at risk to face further reductions in '27. In total, we now start '27 with less total NOI [net operating income] and additional headwinds from capitalized costs." Evercore reduced its price target for the Company's stock from $72 to $64 per share because "the recovery is clearly pushed out another year before FFO might grow again."

351.   All of these negative results that Alexandria announced in connection with the third quarter of 2025 (announced on October 27 and 28, 2025) and in connection with its 2025 Investor Day (announced on December 3, 2025) resulted from the Company's increased impairments. Because of the increased impairments that made Alexandria's properties worth less than previously disclosed, the Company was required to sell far more properties than previously expected to obtain the amount of money needed to fund its business through its disposition program. These vastly increased dispositions (1) lowered the Company's earnings in 2025 as a result of the extraordinary amount of losses incurred on the impairments, (2) required the Company to decrease its dividend because the property sales still did not provide as much funding as the Company needed in light of the impairments, and (3) lowered the Company's expected earnings in 2026 and 2027 because they decreased the Company's revenue base as a result of the need to sell more revenue-generating properties than previously disclosed (which further decreased its ability to fund its dividend). Moreover, the disclosure of the extent of Alexandria's impairments and types of Impaired Properties that it was selling revealed that Defendants had previously misrepresented the nature of the Company's disposition program. Whereas Defendants stated during the Class Period that the Company was withstanding negative macroeconomic conditions and was selling quality properties as part of its disposition program that was designed to sell properties not part of its Megacampus strategy, in fact, the Company was selling properties that were heavily impaired regardless of whether they were part of the Company's Megacampus strategy.

101

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

352.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Alexandria securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

353.    Defendants Marcus, Moglia and Kass had a financial motive to commit fraud. They sold portions of their holdings of Alexandria securities during the Class Period at artificially inflated prices, before the truth was revealed on October 28, 2025 and December 3, 2025, for proceeds of over $2.84 million.

354.    Their stock sales were suspiciously timed to capitalize on the inflated price of Alexandria's stock before the truth was revealed, particularly in light of their lack of open-market purchases during the Class Period and the increased profit that they made by selling their shares at elevated prices above the price of Alexandria's stock after the truth was revealed.

355.    Each of the Individual Defendants also had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described in the Substantive Allegations section above.

356.    The Individual Defendants' scienter is particularly established by the confidential witnesses described above.

357.    CW 1 reported, based on attendance at meetings with Defendant Marcus, that he decided by early 2024 to sell the Long Island City Property and that he was aware at that time of the struggles that the property faced.

358.    Moreover, CW 1 described how Marcus "micromanaged the company" and was involved in all of its major decisions, demonstrating his knowledge about all of the Impaired Properties.

359.    In addition, Defendant Kass's scienter is supported by CW 2, who overheard Kass discussing occupancy issues in the Company's Boston region.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

360. The Individual Defendants' scienter is further established by their making insistent, repeated, and detailed statements about the topics at issue. In addition, the Individual Defendants made many such statements in response to analyst questions that expressed particular concern about potential impairments, how market conditions were impacting the Company's properties, and the Company's disposition strategy. *See supra* ¶¶ 45-46, 77, 165, 179-80, 196, 198-99, 222, 224, 230, 258, 285-87, 310, 325-26. Choosing to make such detailed statements specifically aimed at allaying investors' concerns about these topics demonstrates the Individual Defendants' scienter as to the underlying factual information related to these issues.

361. The Individual Defendants' scienter is also shown by their concealing the true nature of the Impaired Properties that were part of the Company's Megacampus strategy. The decision to alter the description of these properties and mischaracterize them as not part of the Company's Megacampus strategy when announcing the Impaired Properties shows the Individual Defendants' scienter as to the falsity of their prior representations regarding the Company's impairments and disposition strategy.[27]

362. The Individual Defendants' scienter is further established by the admissions that they made after the Class Period about the reasons for the impairments on the Impaired Properties. Those admissions show the Individual Defendants' awareness that the reasons for the impairments were present all along.

363. Defendants Marcus, Moglia and Binda's actual knowledge of the falsity of the alleged misstatements and omissions is further established by their signing of the SOX certifications that certified that the Company's SEC filings were accurate. Before

---

[27] The Impaired Properties were described over the course of the announcement of the Company's results for the third quarter of 2025, Investor Day 2025, and the Company's 2025 10-K. Marcus, Moglia, and Binda signed the Company's 3Q2025 10-Q and 2025 10-K, and all of the Individual Defendants participated in Investor Day 2025, with Binda signing the SEC filing that contained the Company's guidance update.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

vouching for the accuracy of the statements made in Alexandria's SEC filings, the certifying Defendants were obligated to familiarize themselves with the contents of the filings and the underlying operations described therein.

364. The Individual Defendants' scienter is also established because the alleged misstatements and omissions here concerned Alexandria's core operations. In addition to relating the Company's core operation of commercial real estate, the scale of the Impaired Properties shows its core nature to the Company's operations. The $2.2 billion in impairments that the Company suffered in 2025, over $2 billion of which was announced on or after October 27, 2025, caused the Company to (1) switch its 2025 earnings from a $0.50 per share gain to a loss of $8.58 per share, (2) take the drastic step of cutting its dividend by 45%, and (3) hurt the Company's future earnings for years to come. Such a reset in the Company's business constitutes a core operation. The Individual Defendants, by virtue of their roles in senior management and involvement in Alexandria's core operations, would have had knowledge of the true nature of the Company's core businesses during the Class Period. In addition, the Individual Defendants had access to reports and communications describing these operations.

365. Alexandria itself had scienter as to the false and misleading nature of the statements described above based on the scienter of the Individual Defendants. In addition, the Company's scienter can be inferred because its statements about such crucial issues would have been approved by other corporate officials that knew they were false or misleading.

## VIII. NO SAFE HARBOR

366. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged

104

to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

367. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer or top management of Alexandria who knew that the statements were false when made, and/or the forward-looking statement was not accompanied by meaningful cautionary language.

## IX.   CLASS ACTION ALLEGATIONS

368. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Alexandria securities during the Class Period of January 30, 2024 to December 5, 2025, both dates inclusive (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

369. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Alexandria securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

owners and other members of the Class may be identified from records maintained by Alexandria or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

370.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

371.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

372.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Alexandria;

- whether the Individual Defendants caused Alexandria to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Alexandria securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

373. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

374. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Alexandria securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiff and members of the Class purchased, acquired and/or sold Alexandria securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

375. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

107

376.    Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed herein.

## XI.   CAUSES OF ACTION

### COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

377.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

378.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

379.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC.

380.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

381.    These Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and the Class; and (ii) cause Lead Plaintiff and the Class to purchase or acquire Alexandria securities.

382.    Defendants also were individually and collectively responsible for making the false and misleading statements and omissions alleged herein by virtue of having made

108

public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's impairments, disposition strategy, dividend, and financial condition.

383. Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased or acquired Alexandria securities. By virtue of their actions, positions, and associations with Alexandria, these Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, these Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

384. During the Class Period, Alexandria securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying upon the price of the Alexandria securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, purchased or acquired Alexandria securities at artificially inflated prices and were damaged thereby. Had Lead Plaintiff and the other

109

members of the Class known the truth, they would not have purchased or acquired said securities at those prices.

385. By purchasing or acquiring their Alexandria securities at these artificially inflated prices, Lead Plaintiff and the Class members suffered economic losses, which losses were a direct and proximate result of Defendant Alexandria and the Individual Defendants' fraudulent conduct.

386. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

387. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

388. During the Class Period, the Individual Defendants participated in the operation and management of Alexandria, and conducted and participated, directly and indirectly, in the conduct of Alexandria's business affairs. Because of their senior positions, they knew the adverse non-public information about Alexandria's misstatements regarding the Company's impairments, disposition strategy, dividend, and financial condition.

389. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Alexandria's impairments, disposition strategy, dividend, and financial condition, and to correct promptly any public statements issued by Alexandria which had become materially false or misleading.

390. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports,

110

press releases and public filings which Alexandria disseminated in the marketplace during the Class Period concerning Alexandria's impairments, disposition strategy, dividend, and financial condition. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Alexandria to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Alexandria within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Alexandria securities.

391. Each of the Individual Defendants, therefore, acted as a controlling person of Alexandria. By reason of their senior management positions and/or being directors of Alexandria, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Alexandria to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Alexandria and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

392. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Alexandria.

## XII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

393. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

394. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

111

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)

395. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

396. Awarding such other and further relief as this Court may deem just and proper.

## XIII. DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated: April 15, 2026                    Respectfully submitted,


                                         POMERANTZ LLP

                                         */s/ Michael Grunfeld*

                                         Michael Grunfeld (admitted *pro hac vice*)
                                         Brandon M. Cordovi (admitted *pro hac vice*)
                                         mgrunfeld@pomlaw.com
                                         bcordovi@pomlaw.com
                                         600 Third Ave., 20th Floor
                                         New York, NY 10016
                                         Telephone: (212) 661-1100

                                         POMERANTZ LLP
                                         Jennifer Pafiti (SBN 282790)
                                         jpafiti@pomlaw.com
                                         1100 Glendon Avenue, 15th Floor
                                         Los Angeles, California 90024
                                         Telephone: (310) 405-7190

                                         Orly Guy
                                         oguy@pomlaw.com
                                         Eitan Lavie
                                         eitan@pomlaw.com
                                         HaShahar Tower
                                         Ariel Sharon 4, 34th Floor

112

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS: Case No. 2:25-CV-11319-GW (AGRX)

Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111

*Counsel for Lead Plaintiff*

113

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS:  Case No. 2:25-CV-11319-GW (AGRX)